1              IN THE UNITED STATES DISTRICT COURT FOR
              THE WESTERN DISTRICT OF WASHINGTON
2                        AT SEATTLE

3    GENERATION II, INC.,           )
                                    )  Case No. C95-1842C
4              Plaintiff,           )
                                    )  Seattle, Washington
5         v.                        )
                                    )  Jury Trial, Day Three
6    MEDICAL TECHNOLOGY,            )
                                    )  March 30, 2005
7              Defendant.           )
                                    )
8    _____)

9

10

                     TRANSCRIPT OF PROCEEDINGS
11           BEFORE THE HONORABLE JOHN C. COUGHENOUR
                  UNITED STATES DISTRICT JUDGE
12

13

14   For the Plaintiff:        HENRY BUNSOW, ESQ.
                               DUANE MATHIOWETZ, ESQ.
15                             DAVID BILSKER, ESQ.

16
     For the Defendant:        ROY HARDIN, ESQ.
17                             GREG HARRIS, ESQ.
                               MARK BACKENFEN, ESQ.
18

19

20

21

22   SUSAN A. ZIELIE, RPR, CCR
     Official Court Reporter
23   U.S. Courthouse
     700 Stewart Street
24   Seattle, Washington 98101
     (206) 370-8509
25
     Proceedings recorded by computer-aided stenography.

```
 1              SEATTLE, WASHINGTON; WEDNESDAY, MARCH 30, 2005

 2                            9:00 A.M.

 3              THE COURT:  All right.

 4              MR. BUNSOW:  Good morning, Your Honor.

 5    Generation II would call David Little by deposition at

 6    this time.  Mr. Bilsker will be reading the questions

 7    from the deposition and Mr. Levy, a lawyer from our

 8    office, will be playing the part of Mr. Little, if

 9    that's acceptable with the Court.

10              THE COURT:  All right.

11              (The following deposition was read into the

12    record.)

13    Q.   Good morning.  Would you please state your full

14    name for the record.

15    A.   It's Charles David Little, III.

16    Q.   Do you go by David?

17    A.   Yes.

18    Q.   And what is your address, sir?

19    A.   408 Ridgehaven, one word, R-I-D-G-E-H-A-V-E-N,

20    Place in Richardson, Texas 75080.

21    Q.   And at some point you came to work at Bledsoe; is

22    that correct?

23    A.   Bledsoe, I started there in November of '95.

24    Q.   And what was your position when you came to

25    Bledsoe?
```

1    A.   Director of marketing -- of sales and marketing.

2    Q.   Is that still your position?

3    A.   Yes.

4    Q.   Is it your responsibility on behalf of the
5    company to keep the sales force advised of new
6    developments and products at Bledsoe?

7    A.   Yes.

8    Q.   Is Bledsoe Thruster for treatment of patients
9    following high tibial osteotomies?

10   A.   Yes.

11   Q.   Do you know what percentage of its sales relate
12   to braces used for treatment of HTO?

13   A.   I do not know a specific percentage, no.

14   Q.   But it's clearly a market that Bledsoe wants to
15   sell to?

16   A.   Yes.

17   Q.   Thank you.

18              THE COURT:  All right.

19              MR. MATHIOWETZ:  Plaintiffs call to the
20   stand John Hansen.

21              JOHN HANSEN, being duly sworn, testified as
22   follows:

23              THE CLERK:  State your full name and spell
24   your last name.

25              THE WITNESS:  John Lauren Hansen,

1   H-A-N-S-E-N.

2                    DIRECT EXAMINATION

3   BY MR. MATHIOWETZ:

4      Q.   Good morning, Mr. Hanson.

5      A.   Good morning.

6      Q.   By whom are you employed?

7      A.   I'm employed by a company called Navigant

8   Consulting.

9      Q.   And what is your position at Navigant?

10     A.   I'm a director at Navigant and I work out of the

11  San Francisco office.

12     Q.   Can you generally describe Navigant and the

13  nature of work undertaken by your company.

14     A.   Sure.  Navigant is an international consulting

15  firm.  We have approximately 150 consultants and over 35

16  offices.  And Navigant provides accounting and economic

17  litigation related consulting both in the context of

18  general business consulting and in dispute situations

19  such as this.

20     Q.   What are your duties and responsibilities as a

21  director at Navigant?

22     A.   As a director at Navigant, I consult for clients

23  in a variety of industries, that includes both

24  litigation related work such as here today and

25  nonlitigation related work.  And that would include

1    damage analysis and quantification.  As a director at

2    Navigant, I'm also one of the leaders of our national

3    intellectual property practice.

4        Q.  Is it also part of your duties to serve as expert

5    witnesses in cases such as this?

6        A.  Occasionally that happens, yes.

7        Q.  Let's talk briefly about your education and

8    employment history.  Would you please tell the Court and

9    the jury your educational background.

10       A.  Yes.  I graduated from Santa Clara University in

11   1989 with a degree in finance.  I also studied economics

12   and accounting.

13       Q.  Have you taken any courses since graduating from

14   Santa Clara University?

15       A.  I have.  I've taken a couple of classes.  I took

16   an intensive advanced accounting course at Texas A&M.

17   And also took some accounting related classes at

18   University of California, Berkeley.

19       Q.  Following college, what was your first

20   employment?

21       A.  After college, I went to work for a company

22   called Peterson Consulting in San Francisco.  Peterson

23   was a national consulting firm with about 500

24   consultants in 26 offices.  Peterson provides consulting

25   very similar to the nature of the work we do here at

1   Navigant.

2   Q.   You did similar work at Peterson as you're doing

3   now?

4   A.   It evolved over time, but very similar.

5   Q.   And how long were you employed at Peterson?

6   A.   I worked at Peterson Consulting for five years.

7   Q.   When did you leave Peterson Consulting?

8   A.   I left Peterson Consulting in the summer of 1994

9   to join a company called Tucker Allen.

10   Q.   And what was the business of Tucker Allen?

11   A.   Tucker Allen was a business and litigation

12   consulting firm.  So, again, in the same industry as

13   Navigant.  And, in my role there, I provided expert

14   witness testimony and consulting and analysis related to

15   accounting, economic and damages issues.

16   Q.   And how long did you stay with Tucker Allen?

17   A.   I was at Tucker Allen for almost ten years.

18   Q.   And when did you leave Tucker Allen?

19   A.   Tucker Allen was acquired by Navigant last

20   February.  So, up until last February, is when I joined

21   Navigant.

22   Q.   Mr. Hansen, during the course of your career,

23   have you had any area of emphasis?

24   A.   Yes, I have.

25   Q.   And what are those?

1        A.   Most of my work has involved the analysis of

2   damages.  That includes both identifying the appropriate

3   measure of damages as well as the quantification of

4   damages.  Over the last 10 to 12 years, I've had a

5   particular focus on intellectual property matters.

6        Q.   Have you previously been involved in patent

7   infringement disputes?

8        A.   Yes, numerous times.

9        Q.   Do you have any idea of approximately how many

10   matters you've been involved in?

11        A.   Well, I don't maintain any list or account, but

12   it would be in excess of 50 separate matters.

13        Q.   Could you briefly describe your experience in

14   this area?

15        A.   Sure.  Generally, in these cases, our first task

16   is to determine what is the appropriate measure of

17   damages, and then to quantify those damages.  And that's

18   been really across a wide variety of industries ranging

19   from athletic shoes to digital film for cameras to water

20   purification systems, a lot of work with computer

21   hardware and software as examples.

22        Q.   Have you had experience with various types of

23   damages which are available in patent cases?

24        A.   Yes, I have.

25        Q.   Have you had reason to review contracts and

1  licenses and determine reasonable royalty rates?

2     A.  Yes.  In most of the intellectual property cases,

3  one of the issues is the issue of what a reasonable

4  royalty would be.  And so, in most of the patent

5  infringement matters I've been involved with, an aspect

6  of that has been to determine a reasonable royalty rate.

7  And, in connection with that, I've reviewed and analyzed

8  hundreds of separate contracts.

9     Q.  Have you testified as an expert witness prior to

10  today?

11     A.  Yes.  I have testified in deposition, arbitration

12  and in trials.

13     Q.  Do you have an estimate of the number of times

14  that you've been an expert witness?

15     A.  I've testified approximately 15 times.

16     Q.  And, when you've testified as an expert,

17  generally what topics have you testified to?

18     A.  The topics have included damages, economic

19  damages, so the identification of the proper measure of

20  damages, and then the quantification or calculation of

21  those damages.

22     Q.  Have you lectured or given seminars in your area

23  of expertise?

24     A.  Yes, I have provided lectures and seminars

25  related to accounting, economics and damages and

1  valuation type issues.

2  Q.  Can you give us some examples of those lectures

3  and presentations.

4  A.  Sure.  I've presented to the bar association in

5  San Francisco, the intellectual property section, on

6  patent damages.  I was a guest lecturer at the

7  University of California, Hastings College of the Law on

8  patent damages.  And a couple of years ago was presenter

9  at the national meeting for a group called the Licensing

10  Executive Society.  And that's a group of 5,000

11  professionals involved in the industry of licensing

12  intellectual property.

13  Q.  Let's turn our attention to your work in this

14  matter.  What were you asked to do in this litigation?

15  A.  I was asked to analyze and determine Generation

16  II's damages attributing to Bledsoe's infringement of

17  the patents-in-suit.  And, in connection with that, I

18  have assumed that the patents-in-suit are valid and that

19  they are infringed by Bledsoe.

20  Q.  What types of information have you reviewed and

21  relied on in determining Generation II's damages?

22  A.  Our study last involved a variety of different

23  sources of information.  That would include financial

24  documents and information from Generation II, so

25  financial statements.  Additionally, financial

1   information from Bledsoe, listings of the sales of the

2   accused products, as well as units and sales dollars.  I

3   also reviewed Bledsoe financial statements.  There are

4   various license agreements that have been provided in

5   the matter that I've reviewed.  Also looked at and

6   analyzed documents related to the market and market

7   share percentages for the various market participants.

8   I had discussions with Generation II personnel, and also

9   reviewed deposition testimony.

10      Q.   Who did you have discussions with at Generation

11  II U.S.A. and Generation II Orthotics?

12      A.   For Generation II Orthotics, I had discussions

13  with Dean Taylor and Lance Taylor.  For Generation II

14  U.S.A. I had discussions with a gentleman named Al

15  Young, and then some folks from their accounting

16  department as well as their selling and marketing group.

17      Q.   Before we proceed, Mr. Hansen, have you prepared

18  a series of charts to assist us today in communicating

19  your opinions to the jury?

20      A.   Yes, I have.

21      Q.   Have you prepared a chart that presents

22  conceptually your approach to determining damages?

23      A.   Yes.

24      Q.   If you look in your exhibit book at Exhibit 318,

25  please, would you just briefly describe this and tell us

1   whether you have prepared this or have had it prepared

2   on your behalf for this case.

3       A.   Yes.   Exhibit 318 is a summary of my overall

4   approach to calculating damages in this case, and this

5   was prepared at my direction.

6           MR. BUNSOW:   Your Honor, we'd move for

7   admission of plaintiff's Exhibit 318.

8           MR. HARRIS:   I have no objection to 318,

9   Your Honor.

10          THE COURT:   It will be admitted.

11          (Exhibit Admitted.)

12  BY MR. MATHIOWETZ:

13      Q.   Looking at this chart, would you tell us the

14  approach that you've taken.

15      A.   Certainly.   There are two available remedies, two

16  available measures of damages in a patent infringement

17  matter.   The first is lost profits; so, if the

18  infringing sales caused Generation II to lose the sale

19  of a brace, that would be lost profits.

20          The second measure is a reasonable royalty.   And

21  the patent holder is entitled to no less than a

22  reasonable royalty for all the infringing sales of the

23  defendant.   So, to walk you through this chart, I've

24  broken up Bledsoe sales into both domestic sales and

25  international sales, domestic sales being sales in the

1    United States.  For Bledsoe sales in the United States,

2    I have split the award, so I have split or segregated

3    the damages between lost profits and reasonable

4    royalties.  So, for a portion of Bledsoe's infringing

5    sales, I'm claiming that Generation II would have made

6    sales but for the infringement.  The remainder are

7    subject to availability.  So this would go down into the

8    orange circle, the royalty bucket.  For Bledsoe's

9    international sales, all of those braces were

10   manufactured in the United States, and so they would be

11   subject to U.S. patent laws, is my understanding, and

12   therefore one royalty bearing.  So all of the -- all of

13   Bledsoe International sales I've included in the royalty

14   calculation.

15        Q.  Mr. Hansen, have you prepared a chart which

16   summarized Generation II's damages in this case?

17        A.  Yes.

18        Q.  If you would turn to Exhibit 319 in your

19   notebook, is that chart a summary of your damages

20   testimony?

21        A.  Yes.  This is a summary of the damages that I've

22   calculated.

23            MR. BUNSOW:  Your Honor, we'd offer

24   plaintiff's Exhibit 319 into evidence.

25            MR. HARRIS:  Your Honor, we object, and I

1    would like to have a side bar on this.

2              THE COURT:  All right.

3              (Side bar conference, out of the presence of

4    the jury.)

5              MR. HARRIS:  Your Honor, this opinion, as

6    he's expressing to the public, contains reliance by this

7    witness on information that was the subject of our

8    motion in limine.  In response to our motion in limine,

9    plaintiff said that they would call Al Young as a

10   witness.  He's -- Al Young potentially could identify

11   the factual basis on which this opinion is based, but he

12   hasn't been called as a witness, contrary to what they

13   said.  They said they could contact and talk to Mr. Dean

14   Taylor about these subjects so that they could verify

15   and validate that.  The problem, Your Honor, is that the

16   opinions are based on a particular document, trial

17   Exhibit No. 70, which allocates market share.  No one

18   can verify that this document is anything other than

19   numbers on a page.  This witness in deposition could not

20   tell where he got this from or whether it was accurate,

21   and in his testimony in deposition said that this

22   document and these market allocations would have to be

23   provided by a Gen II witness.  That has not been done,

24   there is no basis for his opinion.  And, under Daubert,

25   he shouldn't be allowed to give it.

1              THE COURT:  The objection is overruled.

2              (Side Bar Concluded, Jury Present.)

3              MR. MATHIOWETZ:  Your Honor, we renew our

4    request to enter Exhibit 319 into evidence.

5              THE COURT:  It will be admitted.

6              (Exhibit Admitted.)

7    BY MR. MATHIOWETZ:

8    Q.  Mr. Hansen, if you could look at Exhibit 319 and

9    explain the damages summary that you've prepared.

10   A.  Yes.  This summary is broken up into the two

11   damages elements that I just described.  On the top is

12   lost profits, that includes both loss of profits for

13   Generation II U.S.A. and Generation II Orthotics, which

14   total $2,130,000 approximately.  The royalties are on

15   the bottom half of the sheet.  And, as I mentioned

16   before, there were royalty components for both domestic

17   and international sales, and the royalties total

18   $1,260,000 approximately.  Resulting in total damages of

19   $3,386,145.

20   Q.  We're going to get into more detail about lost

21   profits and your calculation of those, but what are lost

22   profits?

23   A.  What one has to do in this situation is determine

24   what would have happened but for the infringement.  So,

25   if we take Bledsoe out of the market, would Generation

1  II have made additional sales.  And there's a case that

2  sets forth some factors that one can consider, it's

3  referred to as the Panduit decision.  And that provides

4  guidance for someone like myself what types of factors I

5  should look to to determine and help answer the question

6  would Generation II have made additional sales.

7      Q.   You mentioned the Panduit factors.  What are

8  those factors?

9      A.   There were four factors set forth in the Panduit

10  opinion.  The first one is their demand for the patented

11  invention and the patented products.  The second factor

12  is are there acceptable noninfringing substitutes that

13  were available in the market.  The third factor is did

14  the patent holder or Generation II have the capacity to

15  make the additional claimed sales.  And the fourth

16  Panduit factor is just whether or not you can reasonably

17  calculate the lost profits.

18      Q.   John, if you could just pull your microphone a

19  bit closer.  Thank you.

20           Did you determine that there was demand for the

21  patented invention?

22      A.   Yes, I did.

23      Q.   What was your basis for determining that there

24  was a demand for the patented invention in this case?

25      A.   I looked at Generation II's actual sales of

1  products which incorporate the patented invention.  And,

2  from 1995 through the middle of 2003, Generation II

3  U.S.A. sold over 110,000 units of product, which

4  incorporated the patented invention for over $657

5  million.  I also looked at the testimony of Mr. Little

6  from Bledsoe, and he indicated that the adjustability

7  feature was significant.  It was important to customers.

8  And it was also a significant factor in the marketing

9  and sales of knee braces.  And that was confirmed also

10  by Generation II's own marketing literature which touted

11  the patented invention.

12  Q.  The second Panduit factor you mentioned was the

13  absence of acceptable noninfringing alternatives.  What

14  you do you mean by acceptable noninfringing

15  alternatives?

16  A.  An acceptable non-infringing alternative would be

17  a product that provides the benefits of patented

18  inventions without infringing on the patent.

19  Q.  And how does the presence of acceptable

20  noninfringing alternatives impact your calculation?

21  A.  Again, we're trying to determine how many sales

22  Generation II would have made but for the infringement.

23  To the extent that there are other products that are

24  available in the market that are acceptable substitutes,

25  those products may have made sales in place of Bledsoe.

So, to the extent there are acceptable noninfringing

substitutes, one could consider that and the impact that

those companies could make for sales instead of

Generation II.

Q.   To the extent that sales would not have been made

by Generation II, is there still a measure of damages

for the other sales?

A.   Yes, there is.  The Thruster brace would still be

utilizing generation II's patents, and therefore would

have to pay a royalty on those sales.

Q.   The third Panduit factor you mentioned deals with

manufacturing and marketing capability to meet the

demand.  With respect to manufacturing capability, do

you have an opinion whether Generation II U.S.A. and

Generation II Orthotics had the manufacturing capacity

to make the additional sales that you are claiming?

A.   Yes, I believe they did.

Q.   And what's the basis for your opinion?

A.   With respect to Generation II U.S.A. and

Generation II Orthotics, I had discussions with Dean

Taylor and Al Young.  They described the manufacturing

facility to me and described as well the additional

capacity that was present in those plants, which I

understand to be 30 percent, meaning that Generation II

U.S.A. could increase production by 30 percent and then

1    in addition they could add a second shift if necessary.

2    I then took the claimed additional sales and compared

3    that to Generation II's actual sales and determined that

4    that would result in an approximately 11 percent

5    increase in units, which I found would be less than the

6    30 percent, and therefore Generation II U.S.A. had the

7    capacity.

8        Q.   Now, with respect to marketing and selling

9    capability, did Generation II U.S.A. and Generation II

10   Orthotics have the additional capacity for the sales?

11       A.   Yes, they did.

12       Q.   And what's the basis of that opinion?

13       A.   Generation II was a pioneer in the industry.

14   They were one of the market leaders.  And, at the time

15   of the damages period, they had a well-established

16   national distribution and selling network in place.

17       Q.   The last Panduit factor that you mentioned was

18   the amount of profits plaintiff would have made.  Would

19   you please describe this factor.

20       A.   This factor really just asks if you're able to

21   calculate the profits, and I have performed an analysis

22   of Generation II's revenue and costs that we will go

23   through, and so I have been able to do that in this

24   case.

25       Q.   Now, with respect to lost profits damages,

1    looking at Exhibit 319, which is in front of us, can you

2    tell us how you calculated Generation II USA's lost

3    profits of $1,735,335?

4                  MR. HARRIS:  Your Honor, might I have a

5    continuing objection to this line of questions?

6                  THE COURT:  Yes.

7    BY MR. MATHIOWETZ:

8      A.   Certainly.

9      Q.   Have you prepared a chart to help us with your

10   explanation?

11     A.   I have.

12     Q.   If you'd turn to Exhibit 324 in your witness

13   book, have you prepared or had this exhibit prepared on

14   your behalf to assist you today in your testimony?

15     A.   Yes.  This chart summarizes my calculation of

16   Generation II's U.S.A. lost profits.

17                 MR. MATHIOWETZ:  Your Honor, I'd move for

18   the admission of plaintiff's Exhibit 324 into evidence.

19                 MR. HARRIS:  Same objection.

20                 THE COURT:  It will be admitted.

21                 (Exhibit Admitted.)

22   BY MR. MATHIOWETZ:

23     Q.   Generally, Mr. Hansen, what does Exhibit 324 show

24   us.

25     A.   This exhibit focuses just on Generation II U.S.A.

1    and it's a summary of my calculation of lost profits.

2    Lost profits have been calculated for the period of June

3    1995 through January of 2001.  During that period, I've

4    determined that Generation II would have sold an

5    additional 6,723 braces.  The revenue associated with

6    those braces would be approximately $4 million.  From

7    that, I need to deduct the cost that Generation II would

8    incur to manufacture, sell and distribute those

9    products, which is the $2.3 million approximately, which

10   results in the $1,753,000 lost profits figure.

11       Q.   Now, you mentioned that this lost profits

12   calculation was done through January of 2001.  Why did

13   you cut off lost profits at that point?

14       A.   In February of 2001, Bledsoe introduced a brace

15   called the Aligner.  The Aligner brace is not accused to

16   infringe Generation II's patents.  Although Bledsoe

17   continued to sell the Thruster brace and subsequently

18   introduced the infringing Thruster 2 brace, I've

19   determined for purposes of my lost profits calculation

20   that in February 2001 when the Aligner was introduced,

21   I've assumed that Bledsoe could have or would have

22   switched all of their production away from the Thruster

23   braces to the Aligner brace.

24       Q.   How did you determine Generation II's OA brace

25   market share?

 1     A.   To determine Generation II's market share, I was

 2  provided with a summary, an analysis of market share by

 3  Generation II U.S.A., and I took that analysis, and from

 4  that I removed any braces that were not adjustable and

 5  also removed the infringing Thruster braces.  And then,

 6  with the remaining market, I quantified Generation II's

 7  market share in relation to the remaining parties.

 8     Q.   Why do you believe that Generation II's analysis

 9  of the market share was reasonable?

10     A.   I do believe it was reasonable.  And it was

11  consistent with Mr. Little's testimony.  Mr. Little

12  provided testimony that indicated he believed Generation

13  II was the market leader, followed by Donjoy, followed

14  by Townsend, with Bledsoe being fourth after that.  That

15  was consistent with the analysis prepared by Generation

16  II U.S.A.

17          I also reviewed an industry report prepared by a

18  company called Frost and Sullivan that presented market

19  share figures.  And those market share figures for 2001

20  were similar to the market share figures presented in

21  the Generation II analysis.

22     Q.   And you referred to the Frost and Sullivan

23  report.  Could you just briefly describe who Frost and

24  Sullivan is and why that report is of special interest.

25     A.   Frost and Sullivan is an industry research group,

1   and they provide research and reporting out on various

2   industries, and one of the industries that they tracked

3   and covered was the market for OA knee bracing.  And so,

4   therefore, it's an independent third party source that

5   one can use to corroborate information such as market

6   share.

7      Q.   So the Frost and Sullivan report is not something

8   that's paid for by one of the manufacturers; is that

9   right?

10      A.   No, it's not.

11      Q.   Now, there's been some testimony and argument

12   that the market here is actually split into two parts,

13   off-the-shelf and custom braces.  How do you respond to

14   that?

15      A.   I wouldn't agree with that.

16            MR. HARRIS:  Objection, Your Honor, lacks

17   foundation.

18            THE COURT:  Overruled.

19   BY MR. MATHIOWETZ:

20      Q.   And why do you believe -- why do you disagree

21   with that?

22      A.   Several reasons.  First, the analysis that

23   Generation II provided in their opinion that the Frost

24   and Sullivan review would be the market for OA knee

25   bracing.  If we look to the Frost and Sullivan report

1   for purposes of calculating market share, Frost and

2   Sullivan includes off-the-shelf and custom braces in the

3   same market.  Further, Bledsoe individuals have

4   testified that they were competitors with Generation II,

5   that Generation II was one of their primary competitors.

6   If one is your primary competitor, I find it hard to

7   believe that they would be in a different market.

8       Q.   Now, you prepared a series of charts to

9   demonstrate your lost profits calculation?

10      A.   Yes, I've prepared a series of three charts that

11  use the year 2000 to illustrate the calculations.

12      Q.   If you would turn to your exhibit notebook to

13  plaintiff's Exhibit 321.  Is this a chart that you have

14  prepared to assist in presenting your testimony here

15  today?

16      A.   Yes, Exhibit 321 is a summary of my determination

17  of Generation II's market share for the year 2000.

18           MR. MATHIOWETZ:  Your Honor, we'd offer

19  Exhibit 321 into evidence.

20           MR. HARRIS:  Your Honor, I object to this

21  exhibit on the grounds previously stated, and also on

22  the grounds that it purports to combine Donjoy and

23  Generation II, and there's no evidence that's been

24  presented that Donjoy made an infringing device, which

25  is required.

1           THE COURT:   Objection is overruled, it will

2    be admitted.

3           (Exhibit Admitted.)

4    BY MR. MATHIOWETZ:

5    Q.   Referring to Exhibit 321, Mr. Hansen, would you

6    please tell us how you calculated the market share for

7    Generation II U.S.A. in the year 2000.

8    A.   Yes.   As I mentioned earlier, we took the market

9    share analysis provided by Generation II, and from that

10   deducted adjustable braces and the infringing Thruster

11   braces.   We then calculated Generation II's market share

12   relative to the other competitors.   You'll see here that

13   I've highlighted in yellow Donjoy and have in

14   parentheses infringing.   A company called Donjoy that

15   you may have heard of also manufactured two braces that

16   infringed Generation II's patents or accused to infringe

17   Generation II's patents.   There's some -- there's a

18   legal decision that provides guidance in this area

19   referred to as Moreflow, which basically indicates that

20   if there are third-party infringers in the market for

21   purposes of determining how many additional sales the

22   patent holder would have made, it's permissible to

23   include the sales of a third-party infringer as your

24   own.   So I've taken that as an assumption, and I've

25   incorporated that in the analysis.

1    So, if we look at the chart, the impact that I've

2    claimed in the year 2000, Generation II would have made

3    48 percent of the sales that Bledsoe made of its

4    infringing products during that year.

5    Q.   I've noticed that your chart does not include the

6    Bledsoe market share.   Why is that?

7    A.   Bledsoe's brace is what we're trying to allocate

8    to the remaining parties, so we have to remove that to

9    determine the relative pro rata market share of the

10   remaining parties in the market.

11   Q.   Now, with respect to the Donjoy braces, you

12   indicated that you have included them as part of

13   Generation II's market share.   Can you discuss for us in

14   some more detail why you've done that?

15   A.   Sure.   My understanding is that it's Generation

16   II's opinion that the Donjoy braces infringed Generation

17   II's patents.   Subsequently, in 2003, Donjoy received a

18   license from Generation II for the '169 and the '806

19   patents.   So they have now secured a license and are

20   licensed competitors from 2003 on.

21   Q.   Turning to Exhibit 322 in your book, have you

22   prepared an exhibit to assist you today in presenting

23   your testimony with regard to the market share for

24   Generation II U.S.A. in the year 2000?

25   A.   Yes.   Exhibit 322 takes the market share and

1    demonstrates the next step in the process.

2            MR. MATHIOWETZ:  We'd offer into evidence

3    plaintiff's Exhibit 322.

4            MR. HARRIS:  Same objection.

5            THE COURT:  Overruled, it will be admitted.

6            (Exhibit Admitted.)

7    BY MR. MATHIOWETZ:

8    Q.  Would you explain this pie chart for us, Mr.

9    Hansen.

10   A.  Yes.  Again, this deals with the year 2000.  The

11   box in the upper right-hand corner, you'll see the 48

12   percent that we looked at on the previous chart.  The

13   2,816 units is the number of Bledsoe sales in 2000 of

14   the Thruster brace.  So I multiplied 48 percent times

15   Bledsoe sales to come up with 13,527 units, and that's

16   the number of units that I've included in my lost

17   profits calculation.  In the bottom left-hand corner,

18   the remainder, so 52 percent of the 2,816 units, are

19   subject to and included in the royalty calculation.

20   Q.  Now, after you calculated the number of units

21   subject to lost profits, how did you determine

22   Generation II's lost profits?  If you'd turn to Exhibit

23   323 in your notebook, if you could just identify that

24   for us, please.

25   A.  Yes.  This Exhibit 323 provides a more detailed

1   calculation of the lost profits in the year 2000.

2      Q.   Is that a chart that you have prepared to assist

3   in your testimony today?

4      A.   Yes, it is.

5           MR. MATHIOWETZ:  Your Honor, we'd offer

6   Exhibit 323 into evidence.

7           MR. HARRIS:  Same objection.

8           THE COURT:  Overruled, it will be admitted.

9           (Exhibit Admitted.)

10  BY MR. MATHIOWETZ:

11     Q.   Looking at this chart, would you please explain

12  how you've determined Generation II U.S.A.'s lost

13  profits for the year 2000.

14     A.   Sure.  In this chart, again, builds on the

15  previous two charts.  The 1,352 units that we calculated

16  on the previous chart is presented in the green box at

17  the top here.  I then took those units and allocated

18  those across the braces that Generation II actually sold

19  during the year 2000.  So I've assumed that the

20  additional sales would have been made in the same

21  proportion that Generation II actually sold its

22  Unloader, ADJ, Select and Express brace.  So I allocated

23  the units in the first row.  Then I multiplied those

24  units times the actual average price that Generation II

25  received for those units during that year, and that

1    gives me the revenue.  I then apply a margin rate of 45

2    percent, which I calculated based on my analysis of

3    Generation II's costs.  And that will result in the

4    profit.

5        Q.   Looking back at Exhibit 324, the total lost

6    profit units are 6,723; is that correct?

7        A.   That's correct.  That would be a summary

8    following the same methodology I just described for all

9    of the years from June '95 through January of 2001.

10       Q.   Let's talk about the relevant costs.  What are

11   relevant costs that you have deducted?

12       A.   A relevant cost, you could also refer to it as an

13   incremental cost.  That reflects the additional costs

14   that would be incurred by Generation II to manufacture

15   and sell the additional braces.  So it would include

16   items like material, labor, freight, sales commission,

17   costs of that nature.

18       Q.   What did you do to determine the relevant costs

19   in this case?

20       A.   For my analysis of relevant costs, I received

21   very detailed financial statements from Generation II.

22   I then went through those financial statements with

23   their controller and identified the nature of all the

24   costs, what costs were captured in each category, and

25   determined whether or not those costs are costs that

1    would vary with an additional sale.

2        Q.   So, again, looking at Exhibit 324, which is in

3    front of us, it's your calculation that the relevant

4    costs during the entire period for which you've

5    calculated infringement is $2,259,246?

6        A.   That's correct.

7        Q.   And that results in lost profits during that

8    period of $1,753,535?

9        A.   For Generation II U.S.A.

10       Q.   I'm going to refer you back to Exhibit 319.   In

11   the second line, you have Generation II Orthotics.   How

12   did you go about calculating the damages for Generation

13   II Orthotics?

14       A.   For every lost brace sale that Generation II

15   U.S.A. incurs, Generation II Orthotics loses the sale of

16   a hinge or the receipt of a royalty related to that

17   sale.   So, to the extent Generation II U.S.A. loses a

18   sale, Generation II Orthotics also loses profits.

19       Q.   Now, is the same period for calculating damages

20   applicable for Generation II Orthotics as it was for

21   Generation II U.S.A.?

22       A.   Yes, the time period and the units mirror those

23   used in the Generation II U.S.A. calculation.

24       Q.   If you would turn to Exhibit 325 in your book,

25   can you just briefly identify this document for us and

```
 1   tell us if you've prepared that document to assist in
 2   your testimony today.
 3      A.  Yes.  This is a document that I prepared which
 4   presents a summary of my analysis of Generation II
 5   Orthotics' lost profits.
 6              MR. MATHIOWETZ:  Your Honor, we'd move for
 7   admission of Exhibit 325 into evidence.
 8              MR. HARRIS:  Same objection, Your Honor.
 9              THE COURT:  Overruled, it will be admitted.
10              (Exhibit Admitted.)
11   BY MR. MATHIOWETZ:
12      Q.  Can you explain Exhibit 325 to the jury, please.
13      A.  Yes.  As I mentioned before, this relates to
14   Generation II Orthotics and their lost sales of hinges
15   and/or braces if the Express brace Generation II
16   Orthotics supplied a completed product to Generation II
17   U.S.A.  So, depending on if the lost sale is an Unloader
18   ADJ, Select or Express, they would either lose the sale
19   of a hinge or a completed Express brace.  The revenue
20   was calculated based on the revenue that Generation II
21   Orthotics would actually receive for those products.
22   From that, I again determined the costs that would be
23   incurred by Generation II Orthotics to provide the
24   additional units.  I subtracted the costs from the
25   revenues, and that gives me lost profits.  You'll notice
```

1    that I have the C dollar sign, which indicates that

2    these are in Canadian dollars.  So then, on the bottom

3    row, I've taken the lost profits in Canadian dollars and

4    converted those to United States' dollars.

5        Q.   With respect to the revenue, what are the

6    components to the revenue?

7        A.   For Generation II U.S.A. sales of Unloader ADJ

8    and Select braces, Generation II Orthotics would have

9    supplied a hinge for $104 Canadian, or received a

10   royalty for $104 Canadian, and we'll discuss that a

11   little bit later in the testimony.  For the Express

12   brace, it's the cost that Generation II Orthotics

13   charges Generation U.S.A. for that brace.

14       Q.   So, referring back to plaintiff's Exhibit 319,

15   your total lost profits figure for Generation II U.S.A.

16   and Generation II Orthotics combined is $2,120,266; is

17   that correct?

18       A.   That's correct.

19       Q.   Now, the next section or the next damages that

20   you show on your summary of damages is royalties.  What

21   is a royalty?

22       A.   A royalty is a payment from a licensee to a

23   patent holder for use of that invention.

24       Q.   Do you, on this chart, break royalties up between

25   domestic sales and international sales?

1    A.   As I mentioned before, I have split the damages

2    award between lost profits and reasonable royalties.

3    So, for the domestic sales, I split that out separately

4    so that I could determine what amounts were not included

5    in the lost profits calculation to then include in the

6    royalties determination.  And, as I mentioned before,

7    Bledsoe provided an independent list of their

8    international sales, so I've added that into the

9    royalties as well.

10   Q.   How did you determine the appropriate royalty

11   rate to apply in this matter?

12   A.   In these situations, one conducts what's referred

13   to as a hypothetical negotiation.  This is obviously a

14   license agreement that didn't happen because we're here

15   today.  So what the expert needs to do is put the

16   parties back in time at the date of first infringement

17   at the negotiating table and try to determine what

18   royalty rate they would have agreed to.  And, in that

19   situation, it's incumbent upon me to assume and for both

20   parties to assume that the patent-in-suit is valid and

21   infringed.

22   Q.   What is the date of the hypothetical negotiation?

23   A.   The date of the hypothetical is March of 1995.

24   Q.   Have you prepared a chart that lists each of the

25   Georgia-Pacific factors?

1    A.   Yes, I have.

2    Q.   Is that Exhibit 326 in your notebook?

3    A.   Yes.

4         MR. MATHIOWETZ:   Your Honor, we'd move for

5    admission of Exhibit 326 into evidence.

6         MR. HARRIS:   I have no objection.

7         THE COURT:   It will be admitted.

8         (Exhibit Admitted.)

9    BY MR. MATHIOWETZ:

10   Q.   Mr. Hansen, could you briefly describe for us the

11   Georgia-Pacific factors which are shown in Exhibit 326.

12   A.   Yes.   First, I should note that the

13   Georgia-Pacific is the opinion that sets forth the

14   hypothetical negotiation construct, so this is the

15   approach that's commonly used in these situations.   And

16   Georgia-Pacific provided 15 separate factors for

17   consideration in determining what royalty rate would

18   have been agreed to by the parties.   And, I'm not going

19   to go through and read all of these for you, but I've

20   broken them down into three major groups.

21        The first is license scope and deals.   And that

22   really deals with what is the scope of the license

23   that's the subject of the hypothetical negotiation and

24   are there any license agreements or deals out there that

25   are instructive or provide guidance for what the parties

1    may have agreed to in this situation.

2         The second section I've labeled profitability and

3    business considerations.  And that deals primarily with

4    issues such as what is the commercial relationship of

5    the parties, are they competitors, or is it a situation

6    where you have an inventor and parties who are going to

7    try to commercialize the invention.  These factors also

8    include issues related to the profitability of the

9    infringing product.

10        The third I've labeled technical and benefits.

11   And those factors really deal with what are the benefits

12   of the patented invention.  And then, overall, to

13   summarize really is what the reasonable royalty rate

14   that you've determined in this matter.

15   Q.   Now, have you considered all of these

16   Georgia-Pacific factors in establishing a reasonable

17   royalty?

18   A.   Yes, I did consider them all.

19   Q.   Are all of the factors given the same weight?

20   A.   Depending on the facts and circumstances of the

21   case, some factors may be more instructive or relevant

22   than others.

23   Q.   If you would refer to Exhibit 327 in your

24   notebook, please.

25   A.   Okay.

1    Q.   Would you tell us if this is a chart that you

2    have prepared to assist in your testimony here today?

3    A.   Yes.  As I just mentioned, some of the

4    Georgia-Pacific factors are more relevant than others.

5    This chart, Exhibit 327, is a summary of what I find to

6    be the more relevant factors and considerations for

7    determination of a royalty in this matter.

8                   MR. MATHIOWETZ:  Your Honor, we'd move for

9    admission of Exhibit 327 into evidence.

10                  MR. HARRIS:  No objection.

11                  THE COURT:  Admitted.

12                  (Exhibit Admitted.)

13   BY MR. MATHIOWETZ:

14   Q.   Starting in the first bullet point, Mr. Hansen,

15   could you describe for us the consideration of

16   Generation II USAs -- Generation II USA's agreement with

17   Generation II Orthotics.

18   A.   Yes.  Generation II U.S.A. entered a license

19   agreement with Generation II Orthotics initially in

20   1999.  That was revised effective June 1, 1995, and

21   there was a subsequent amendment to that in 2001.  And,

22   under the terms of that agreement, Generation II U.S.A.

23   was granted rights to the '169 and the '806 patents.

24   Q.   What was the royalty rate in the June 1995 of

25   Generation II U.S.A.'s license agreement with Generation

1   II Orthotics?

2       A.   That agreement contained a royalty provision

3   which called for a royalty of $104 Canadian for every

4   brace that is sold by Generation II U.S.A.  It also

5   contained a clause which allowed them to receive a

6   credit against those royalties if they were to purchase

7   the hinge from Generation II Orthotics for $104

8   Canadian.

9       Q.   And that agreement was amended in 2001; is that

10  correct?

11      A.   Yes.  There was a limited amendment in 2001 that

12  related specifically to a brace called the Spirit.  And

13  for Spirit braces manufactured and sold by Generation II

14  U.S.A. they were to pay Generation II Orthotics $70

15  Canadian.

16      Q.   If you would turn to Exhibit 328 in your exhibit

17  notebook, please.  Is this a chart that you have

18  prepared to assist in giving your testimony here today?

19      A.   Yes, it is.

20          MR. MATHIOWETZ:  Your Honor, we'd move for

21  admission of Exhibit 328 into evidence.

22          MR. HARRIS:  No objection.

23          THE COURT:  It will be admitted.

24          (Exhibit Admitted.)

25  BY MR. MATHIOWETZ:

1    Q.  Could you explain how you have calculated

2    effective royalty rates as set forth in Exhibit 328.

3    A.  Sure.  As I just mentioned, the license agreement

4    called for a royalty of $104 Canadian or $70 Canadian.

5    So what this chart does is tries to convert those

6    amounts into a percentage of revenue.  So the first row

7    deals with the Generation II Unloader ADJ and Select

8    braces.  The next column has the average actual selling

9    price for those braces.  The royalty per unit, $100

10   Canadian, converts to approximately $75 U.S.  If I

11   divide the $75 by the average price per unit, that gives

12   me an effective royalty rate of between 11 and 12

13   percent.

14        The second row deals with the Spirit brace, for

15   which there was a $70 royalty per unit.  The average

16   price was $462.  I divide the $50, which is the $70

17   Canadian converted to U.S., by the $4,672, that gives me

18   11 percent effective royalty rate.

19   Q.  Now, you have a third entry in your chart,

20   Bledsoe Thruster.  Bledsoe is not part of any license

21   agreement between Generation II U.S.A. and Generation II

22   Orthotics.  Why did you calculate the effective royalty

23   rate for Bledsoe in this chart?

24   A.  That's correct, Bledsoe was obviously not a party

25   to that agreement.  So what I've tried to do on the

1  final row is determine if Bledsoe were required to pay

2  the same royalty rate, the same per unit royalty rate

3  that Generation II U.S.A. paid, what would that reflect

4  as far as effective royalty rate.  So I've taken the $50

5  to $70 royalty per unit amounts, divided those by the

6  actual average price of the Thruster brace.  And that

7  results in a 11 to 17 percent effective royalty rate.

8  That's what the Bledsoe royalty would be if they were

9  required to pay the same amount as Generation II U.S.A.

10  Q.  This is all part of your calculation to try to

11  come up with what would be a reasonable royalty rate to

12  apply in this case; is that right?

13  A.  That's correct.

14  Q.  Turning back to Exhibit 327, the second bullet

15  item states, Bledsoe and Generation II U.S.A. are direct

16  competitors.  What's the basis of the fact that they are

17  direct competitors?

18  A.  In situations where the licensee and the licensor

19  are competitors, it can be a very significant factor in

20  that, if the patent holder is going to grant a license

21  to a competitor, it could result in lost sales.  So this

22  would consider their lost sales and profits when they're

23  negotiating the royalty.

24  Q.  Moving on to the next point, what do you mean by

25  Generation II U.S.A. incremental profits are 42 percent

1    to 45 percent?

2        A.   For every sale that Generation II makes, they

3    earn incremental profits of 42 to 45 percent.  So, to

4    the extent they license a company like Bledsoe and lose

5    a sale, they lose a 45 percent margin on that sale.

6            In addition, as I've discussed, Generation II

7    Orthotics would also incur lost profits.  That would be

8    in addition to the lost margin for Generation II U.S.A.

9        Q.   Is it fair to assume that the higher the

10   incremental profits for the lost sale, the higher

11   reasonable royalty that would be appropriate?

12       A.   That's fair.

13       Q.   Next, on Exhibit 327, you indicate that Bledsoe

14   profits for infringing products are 22.5 percent higher.

15   Can you explain for us what you mean by that.  And, if

16   you would turn to Exhibit 329 in your notebook, please.

17       A.   Sure.

18       Q.   Is this a chart that you've prepared to assist in

19   your testimony here today?

20       A.   Yes.  This is my analysis of comparison of

21   Bledsoe's profits.

22            MR. MATHIOWETZ:  Your Honor, we'd move for

23   the admission of Exhibit 329 into evidence.

24            MR. HARRIS:  Object to this, Your Honor.

25   It's the document I've never seen before other than in

1  this context of this trial.  It's never been presented

2  as part of his report.

3           THE COURT:  Is that correct, counsel?

4           MR. MATHIOWETZ:  Actually, it is referred to

5  in one of his exhibits to his deposition testimony and

6  in his -- which is his report.

7           THE COURT:  Was it contained as -- was the

8  exact document contained as an exhibit in that

9  deposition?

10          MR. MATHIOWETZ:  The exact document was not,

11  but clearly all of the content of the document was set

12  forth in his report.

13          THE COURT:  Objection sustained.

14 BY MR. MATHIOWETZ:

15   Q.  Could you just describe for us how you had

16  determined that the Bledsoe profits on the infringing

17  products are 22 and a half percent greater than they are

18  for its noninfringing products.

19   A.  Certainly.  And this again can be a primary

20  factor impacting what amount the licensee would be

21  willing to or able to pay.

22       Bledsoe had provided some information which

23  documented their direct costs, labor and material that

24  would be incurred in the production of every Thruster

25  brace.  They also provided us, as mentioned, audited

1   financial statements.  Those audited financial

2   statements contained a breakdown of the cost of goods

3   sold, which separately broke out material and labor.

4   Mr. Day, who was Bledsoe's controller, testified that

5   the $44 direct cost per Bledsoe's Thruster brace was

6   calculated on the same basis as the information in

7   Bledsoe's audited financial statements.  So, using those

8   two points, I was able to determine that, for the

9   Thruster brace, Bledsoe earns approximately 22 percent

10  higher margin than they do for all of their other

11  products.  So, at the end of the day, if they make $100

12  in sales, they would end up with $22 of additional

13  profit on the Thruster brace versus the other products

14  that they sell.

15      Q.  What's the significance of the fact that Bledsoe

16  makes $22 and a half percent more profit on its

17  infringing products than on its noninfringing products?

18      A.  It's an indication that Bledsoe could pay up to a

19  22 and a half percent royalty on the Thruster brace and

20  still be left with profits that are equivalent to what

21  they earn on the rest of their business.

22      Q.  Now referring back to Exhibit 327, the next entry

23  there is Dr. Noyes's agreement, indicates that Bledsoe

24  can pay a 15 percent royalty.  Can you describe that for

25  us, please.

A.   Yes.  And I know there has been some testimony about the agreement with Dr. Noyes.  Bledsoe entered an agreement with Dr. Noyes related to testing and evaluation, publication of some test results, and some assistance with advertising and promotional materials for the Thruster knee brace.  And, under that agreement, Bledsoe was to pay Dr. Noyes 15 percent of the revenue that it receives for the sale of the Thruster brace.

Q.   Did Dr. Noyes's agreement include any patent?

A.   No, it did not.

Q.   Then why is it relevant to the hypothetical negotiation?

A.   The agreement with Dr. Noyes is from June of 1995, so that's just three months after the date of the hypothetical negotiation in this case.  And that indicates to me that Bledsoe was able to and willing to pay a 15 percent royalty rate and still be left with profits that it felt were adequate.

Q.   Finally, the last royalty rate consideration set forth in Exhibit 327 is DJ Orthopedics Limited license to the '169 and '806 patents for $4 million.  Can you explain that, please.

A.   Sure.  As I mentioned earlier, DJ Orthopedics, which we've also referred to as Donjoy, entered a license agreement with Generation II in May of 2003.

1   And, under that license agreement, Donjoy was granted

2   rights to the '169 and the '806 patents, the patents at

3   issue in this case.  And, for that license, Donjoy paid

4   Generation II $4 million.  That was a lump sum license

5   fee.  You will notice in my bullet point I used the term

6   limited, and that's because Donjoy was only granted

7   limited use rights to those patents.  In this situation

8   under the hypothetical negotiation, Bledsoe's rights

9   would not be limited in any fashion, so that would

10  arguably be worth more.  So the limitation would put

11  downward pressure on the license rate.

12      Q.   Mr. Hansen, are you aware that Bledsoe has

13  licensed patents for some of its products?

14      A.   Yes, I'm aware of at least three license

15  agreements that Bledsoe entered into where they paid

16  royalties for patent use rights.

17      Q.   And how do those agreements effect your analysis?

18      A.   Those agreements provide a benchmark for a

19  metric.  Under those agreements, Mr. Bledsoe paid 7

20  percent on a couple of the agreements, one of them had a

21  sliding royalty scale.  One of the agreements was as low

22  as 3 percent, which had a clause which allowed the

23  royalty rate to be reduced to 2 percent under certain

24  circumstances.  So those are the rates that Bledsoe had

25  agreed to for other products.

1    Q.   Taking all of these considerations into account,

2    what reasonable royalty rate do you believe is

3    appropriate in this case?

4    A.   Based on my analysis and of the Georgia-Pacific

5    factors, I believe a 10 percent royalty rate would be

6    reasonable in this circumstance.

7    Q.   And you've taken that 10 percent royalty rate and

8    calculated the total royalty damages which are due; is

9    that correct?

10   A.   That's correct.

11   Q.   If you would look at Exhibit 330 in your notebook

12   and tell us if this is a summary of your royalty

13   calculations.

14   A.   Yes.   This is a summary of my calculation of

15   domestic royalties.

16             MR. MATHIOWETZ:   Your Honor, we'd move for

17   admission of Exhibit 330 into evidence.

18             MR. HARRIS:   No objection.

19             THE COURT:   Admitted.

20             (Exhibit Admitted.)

21   BY MR. MATHIOWETZ:

22   Q.   Would you explain your calculations for us, Mr.

23   Hansen?

24   A.   I will.   And it's a little bit of a detailed

25   chart.

1        The first column just indicates the time period

2   that we're looking at.

3        The second column is a summary of Bledsoe's

4   domestic sales revenue for the Thruster and Thruster 2

5   braces by time period.  You'll recall that we, for a

6   portion of the sales from June of '95 through January

7   2001, I claimed lost profits.

8        The third column reflects the market share that I

9   have assigned to other manufactures, so I make an

10  adjustment for that.

11       And the fourth column titled Revenue reflects the

12  total domestic sales revenue of Bledsoe after I remove

13  the revenue that I've included in my lost profits

14  calculation.  So, the fourth column, the $9.4 million

15  approximately is the amount that's subject to reasonable

16  royalty.

17       And, the final column, I just applied the 10

18  percent royalty, and come up with total royalty of

19  939,026.

20  Q.   Those are for domestic sales; is that correct?

21  A.   That's correct.  That's for the domestic portion.

22  Q.   Now, turning back again to Exhibit 319, you've

23  also shown royalties for international sales.  Could you

24  just briefly describe your calculation.

25  A.   Yes.  Bledsoe, as I mentioned, provided separate

1   summaries of their international sales.  All of the

2   Thruster braces are manufactured in the United States

3   and would therefore be subject to United States' patent

4   law and would be subject to the hypothetical license

5   agreement.  Bledsoe had total International sales of

6   $3,268,528.  I apply the 10 percent royalty rate to that

7   figure.  And that results in the total damages of

8   $326,853.

9      Q.  If you'd just turn in your exhibit notebook to

10   Exhibit 331, is that chart a summary of your calculation

11   of international royalties?

12      A.  Yes.  Exhibit 331 is my calculation of the

13   royalties for international sales.

14           MR. MATHIOWETZ:  Your Honor, I'd move for

15   admission of Exhibit 331 into evidence.

16           MR. HARRIS:  No objection.

17           THE COURT:  Admitted.

18           (Exhibit Admitted.)

19   BY MR. MATHIOWETZ:

20      Q.  Now referring back to plaintiff's Exhibit 319,

21   having discussed or having analyzed all of these

22   factors, what is your opinion with regard to the damages

23   that have been incurred by Generation II U.S.A. and

24   Generation II Orthotics in this matter?

25      A.  I believe we've gone through all of the elements

1    of the damages on this chart, both the lost profits and

2    the reasonable royalties.  And, in my opinion, the total

3    damages that Generation II incurred is $3,386,145.

4              MR. MATHIOWETZ:  Thank you, Mr. Hansen.  No

5    further questions.

6              THE COURT:  All right, Mr. Harris.

7              MR. HARRIS:  Thank you, Your Honor.

8                       CROSS EXAMINATION

9    BY MR. HARRIS:

10      Q.  Good morning, Mr. Hansen.

11      A.  Good morning.

12              MR. HARRIS:  Your Honor, may I approach the

13   witness, please?

14              THE COURT:  Yes.

15   BY MR. HARRIS:

16      Q.  Mr. Hansen, I've put before you your deposition,

17   it was taken twice in two different sessions, on October

18   24th and on November 20th; is that correct?

19      A.  That's correct.

20      Q.  As to your experience -- I'm sorry.  You assumed

21   that the patent is valid and that it is infringed; is

22   that correct?

23      A.  That's correct, that's an assumption.

24      Q.  So, if the jury finds contrary to that,

25   everything you've talked about here to the jury may be

1    interesting but it is relevant?

2        A.   Assuming it is invalid, there are no damages.

3        Q.   Are you an accountant?

4        A.   I believe I refer to myself as an accountant.

5        Q.   Are you a CPA?

6        A.   At the current time, no.

7        Q.   You've been involved with three trials; is that

8    correct?

9        A.   Yes.

10       Q.   One was a maritime personal injury; is that

11   correct?

12       A.   That's correct.

13       Q.   One was with a breach of contract; is that

14   correct?

15       A.   That was an arbitration.

16       Q.   I'm sorry.  Have you been involved in a trial and

17   two arbitrations?

18       A.   It's been two arbitrations and three trials.

19       Q.   Okay.  Have you been involved in a patent trial?

20       A.   Yes, I have.

21       Q.   As a witness in court?

22       A.   Yes.

23       Q.   Was that after your deposition was taken?

24       A.   I believe both patent trials would be after my

25   deposition.

1    Q.   So, at the time of your deposition in October of

2    2003, you had not been involved in any patent trials; is

3    that correct?

4    A.   I had not testified in trial on a patent case,

5    that's correct.

6    Q.   And you were involved in two arbitrations, a

7    breach of contract and a maritime case; is that right?

8    A.   That's correct.

9    Q.   Have you ever participated in a patent

10   negotiation, a license negotiation?

11   A.   I have supported license negotiations on numerous

12   occasions.  I don't believe I've actually sat in the

13   negotiating session.  That's generally been left to the

14   lawyers and the business owners.

15   Q.   Would you refer to your deposition, please, this

16   is taken 10/24/2003, page 8 line 8.

17   A.   Okay.

18   Q.   Question, have you participated in any way in

19   negotiations -- by that, I mean you were in the

20   negotiation session -- in connection with any patent

21   license negotiation?  Answer, I don't believe so.  Is

22   that what you said at that time?

23   A.   Yes.  And the that's what I just said, I haven't

24   participated in the actual negotiating session.

25   Q.   You've been involved in one instance of

1    negotiations before negotiations actually began, as

2    contrasted with commenting on negotiating positions; is

3    that correct?

4        A.   I believe I said that I'm not always privy to the

5    on-going negotiations and whether or not there have been

6    negotiations.  So my consulting commonly involves

7    assisting counsel with evaluating settlement positions,

8    potential royalty rates, strategy setting, and that may

9    or may not have been before any initial negotiations.

10       Q.   The slides that you've presented here today were

11   not included in your report; were they?

12       A.   That's correct.

13       Q.   Your report was quite a bit more detailed and has

14   a lot more figures than those charts; don't they?

15       A.   There were some detailed calculations, correct.

16       Q.   As a matter of fact, you've made three reports in

17   this case concerning damages; is that correct?

18       A.   I've authored two reports and participated in a

19   third.

20       Q.   The first report was issued by Mr. Meyer of

21   Tucker Allen; is that correct?

22       A.   That's correct.

23       Q.   That was in 1998; correct?

24       A.   That's correct.

25       Q.   And it contains a different methodology of

1   calculating damages than that which you've told the jury

2   here today; is that correct?

3   A.   There was some different claim elements and

4   approaches that were contained in the 1998 report.

5   Q.   In the 1998 report, Generation II claimed lost

6   profits for every single sale that Bledsoe had made; is

7   that correct?

8   A.   That's correct.

9   Q.   There was a second report issued in 2002 which

10  you did author; is that correct?

11  A.   Yes.

12  Q.   And Generation II in that report claimed lost

13  profits for every single sale; is that correct?

14  A.   There were two lost profits calculations

15  presented in the 2002 report.  One was based on the

16  assumption that Generation II would make every sale that

17  Bledsoe had made, the second calculation was based on

18  the market share approach.

19  Q.   And, when you made those reports, you thought

20  that that was a reasonable calculation; didn't you?

21  A.   I believed it was.

22  Q.   Based upon what people from Generation II told

23  you, you thought that they would capture all of the

24  Thruster sales; is that right?

25  A.   That was based upon what I knew from Generation

1    II as well as the testimony of Bledsoe individuals.

2       Q.   If you'd followed that same methodology in

3    calculating your lost profits here, do you have any idea

4    what the profits would have been that Generation II

5    would be seeking from this jury?

6       A.   Haven't done that calculation.

7       Q.   The modification to change to the methodology

8    that you've presented here didn't occur until August of

9    2003; is that correct?

10      A.   I'm not certain I follow that question.

11      Q.   You didn't change the methodology of calculating

12   damages to simply an allocated portion of the market

13   until you issued your report on August 4th of 2003; is

14   that correct?

15      A.   I don't believe that's correct.

16      Q.   You had both measures in the year 2002 report.

17      A.   I believe so.

18      Q.   But you didn't fix on the measure that you've

19   told this jury is the proper measure until 2003, August

20   of 2003; is that correct?

21      A.   I wouldn't agree with that.  In the 2002 report,

22   I presented both measures of damages.

23      Q.   Which meant that you were still thinking that the

24   overall complete capture of profits was a proper

25   measure; wasn't that your opinion at that time?

1    A.   That that was a measure that potentially would be

2    appropriate.

3    Q.   That it was a proper measure, or you wouldn't

4    have included it in your report; is that correct, Mr.

5    Hansen?

6    A.   That's correct, given the underlying facts and

7    circumstances.

8    Q.   So this suit had been pending for eight years

9    before this analysis of damages was presented; is that

10   right?

11   A.   If you mean before the report that I authored in

12   its final form, I did author that in 2003, that's

13   correct.

14   Q.   And so it was eight years before the

15   presentation -- the slides and everything weren't in

16   your report, were ever presented to Bledsoe; is that

17   correct?

18   A.   The 2003 report reflects the production of

19   additional material over time and the evolution of the

20   case.

21   Q.   Were there other changes that you made between

22   those reports?

23   A.   Between the 2002 and 2003 --

24   Q.   Between the 1998 report, which is only three

25   years after the lawsuit was filed, and the 2003 report,

1    which was eight years after the lawsuit was filed.

2        A.   There were some other changes.

3        Q.   And what other changes did you make in the

4    methodology so that you could more accurately reflect

5    the damages, in your opinion?

6        A.   Well, there would be a couple of changes in

7    methodology during that time period.   There was a claim

8    element that was dropped.   And, as I indicated in my

9    testimony, I cut off the lost profit damages in February

10   of 2001.   Those would probably be the major approach

11   changes.

12       Q.   What claim element was dropped?

13       A.   In the 1998 report, if I recall, there was a

14   claim that was put forth assuming that Generation II

15   would have sold the Express brace earlier than it

16   actually did.

17       Q.   And that was dropped out of the 2003 report?

18       A.   That was dropped out of I believe the 2002

19   report, the first report that I authored.

20       Q.   What was the other major change you made?

21       A.   I believe the other major change I mentioned was

22   stopping the lost profits calculation after the

23   introduction of the Aligner brace.

24       Q.   And that was based upon a date that was given to

25   you by Mr. Mathiowetz; is that right?

1    A.   That was based upon the date at which the Aligner

2    brace was actually introduced.

3    Q.   Are you familiar with the Grain Processing case?

4    A.   Yes, I am.

5    Q.   And do you use it in your analysis of patent

6    damages?

7    A.   The Grain Processing case, depending on the facts

8    and circumstances, may be relevant to a case, certainly.

9    Q.   The Grain Processing case holds -- and correct me

10   if I'm wrong -- that if a person who is an alleged

11   infringer has a noninfringer alternative that would be

12   available to him, even though it was not actually in the

13   market, lost profits won't flow against that person; is

14   that correct?

15   A.   That's generally correct.  That, if they had an

16   alternative that was known, knowable, could have been

17   built, produced and manufactured, that that could impact

18   the person's ability to -- the plaintiff's ability -- to

19   claim lost profits after the date at which that product

20   could have been introduced.

21   Q.   And you were simply told what that date would be

22   by Mr. Mathiowetz; is that right?

23   A.   As I mentioned, I used the date that the Aligner

24   brace was actually introduced.

25   Q.   You didn't inquire or analyze whether it could

1   have been introduced at an earlier date; is that

2   correct?

3       A.   That's correct, I haven't done any independent

4   analysis in that regard.

5       Q.   Now, isn't it a matter of fact that you have done

6   no market analysis?

7       A.   I wouldn't agree with that.

8       Q.   Have you got factual information that you

9   yourself know as a fact concerning the allocation of

10   market share in the adjustable brace/knee brace

11   business/OA business during the period 1994 through

12   2001?

13       A.   I do have and have utilized in my calculations

14   Generation II's actual sales.  And, as I indicated

15   earlier, I also reviewed and corroborated the market

16   share percentages in a general nature with testimony.

17   And also reviewed the Frost and Sullivan industry report

18   for 2001.

19       Q.   You say you've reviewed the Frost and Sullivan

20   report of 2001; correct?

21       A.   That's correct.

22       Q.   At the time of your deposition in 2003, had you

23   reviewed the Frost and Sullivan report?

24       A.   No, I had not been provided with that.

25       Q.   So the opinions that you have expressed here are

1    opinions that you had reached in 2003; is that correct?

2        A.   That's correct.

3        Q.   And so -- and the opinion that you reached in

4    your report in 2003 contained market allocation

5    information; is that right?

6        A.   It did through 2001.

7        Q.   So you didn't rely on the Frost and Sullivan

8    report in preparing your report in anyway because you

9    didn't read it until after you'd done the report; is

10   that correct?

11       A.   That's correct.  The Frost and Sullivan report

12   confirmed the reliability and reasonableness of the

13   market share calculation.

14            MR. HARRIS:  I move to strike everything

15   after that's correct, Your Honor.

16            THE COURT:  Overruled.

17   BY MR. HARRIS:

18       Q.   You were provided with a document from Generation

19   II which purported to allocate market share, and you

20   used that document as your basis of allocation; is that

21   correct?

22       A.   I was provided with a document from Generation

23   II, that's correct.

24       Q.   Let me show you exhibit -- the first page of

25   Exhibit 106.  And, since we're going to do it this way,

```
 1   why don't you thumb all the way through the exhibit,
 2   because I think that you will recognizes this.
 3       A.   Is there a copy that I can thumb through?
 4              MR. HARRIS:   This is one of plaintiff's
 5   exhibits, Your Honor.   I move the admission of 106.
 6              MR. MATHIOWETZ:   No objection.
 7              THE COURT:   Admitted.
 8              (Exhibit Admitted.)
 9   BY MR. HARRIS:
10       Q.   Do you recognizes Exhibit 106?
11       A.   Yes, I do.
12       Q.   And this is a document that was given to you by
13   Generation II?
14       A.   That's correct.
15       Q.   And you don't know who produced it; is that
16   correct?
17       A.   I understand that it was provided by Generation
18   II including --
19       Q.   But you don't know who the person was; is that
20   right?
21       A.   I believe it was prepared by Al Young and Dean
22   Taylor and other people involved in the selling and
23   marketing aspects of Generation II's business.
24       Q.   Are you aware that the testimony of Mr. Young is
25   that this was prepared by a man named Reg Olsen?
```

1    A.   Yes.  And Reg Olsen as well.  And I should also

2    add a person named Ron Massero for the later periods.

3    Q.   You did not for this period because Mr. Massero

4    didn't work there during this period.  This covers 1992

5    through 1997; is that right?

6    A.   That's correct.

7    Q.   And you received this document from people at

8    Generation II; correct?

9    A.   Yes.

10   Q.   Did you ever do anything to verify its accuracy

11   during the time that you were doing your work?

12   A.   Yes.  As I mentioned, I had discussions with Al

13   Young, Dean Taylor and also reviewed deposition

14   testimony from Bledsoe individuals related to who the

15   competitors were and the general ranking of competitors

16   and their market shares.

17   Q.   Let's look at the second page of Exhibit 106.

18   And that would be the information that was provided to

19   you by Generation II in 1995; is that correct?

20   A.   The second page relates to the year 1995.

21   Q.   Is it your understanding that this information

22   was collected to be an estimate of the number of units

23   that were sold for everyone except Generation II?

24   A.   I think that's a fair characterization.

25   Q.   Was it your understanding that the percentages

```
1   then were assigned based upon these estimates of units

2   sold?

3       A.   Could you repeat the question, please.

4       Q.   Was it your understanding that the percentages of

5   market that were assigned to the parties were based upon

6   the estimates of units sold?

7       A.   I believe that this chart reflects Generation

8   II's best understanding as to what the relative sales

9   would be for the parties.  So, for a party that may have

10  been -- they had a belief as to a certain number of

11  units that were sold, and other competitors, they may

12  have had a belief that they were equivalent to that, or

13  half that, or something of that nature.  So, in a

14  general sense, I would agree with that.

15      Q.   Okay.  And, in this document, on the page 2, it

16  shows that Bledsoe sold 2,000 units in 2005 -- excuse me

17  -- in, 1995; is that correct?

18      A.   That's correct.

19      Q.   Now, you had access to all of Bledsoe's sales

20  records; is that right?

21      A.   Yes.

22      Q.   You would have been able to go to those records

23  and verify whether that number that was assigned by

24  whoever did this report, who we haven't heard from,

25  whether that was a right number or a wrong number;
```

1  correct?

2      A.  Yes.

3      Q.  Did you do that?

4      A.  Yes, I did.

5      Q.  And what did you determine Bledsoe's actual sales

6  were in 1995?

7      A.  I don't recall the exact number.

8      Q.  Isn't it included in the materials that you

9  included in your report?

10     A.  Yes.

11     Q.  What page would that be on?

12     A.  I believe that would be either attachment 4 or 5

13  of the 2003 report.

14          MR. HARRIS:  Your Honor, if I could have the

15  Exhibit 335B.  335B.  It's plaintiff's exhibit, so I

16  would move the admission of 335B.

17          MR. MATHIOWETZ:  No objection.

18          THE COURT:  It will be admitted.

19          (Exhibit Admitted.)

20  BY MR. HARRIS:

21     Q.  Second page.  Is this the document you're

22  referring to?

23     A.  That is, although that reflects the adjustment,

24  the update, just prior to trial.

25     Q.  I understand.  But, as to the 1995 Bledsoe sales,

1   it's the very first number on the left-hand column of

2   numbers; is that correct?

3     A.  That would be for the period June through

4   December 1995.

5     Q.  And that was when Bledsoe sold the units, began

6   selling in June?

7     A.  They began selling in March.

8     Q.  Was there some reason you didn't include sales

9   before June?

10     A.  We started the calculation June 1st.  That was

11   the effective date of the 1995 license agreement between

12   Generation II U.S.A. and Generation II Orthotics.

13     Q.  So do you understand that there were sales that

14   occurred between -- before June of 1995?

15     A.  Yes, there were.

16     Q.  Do you know the amount of those sales?

17     A.  Yes.

18     Q.  Is there some other document you can go to?

19     A.  I have in front of me attachment 5 to my 2003

20   report.

21     Q.  Yes.

22     A.  And, looking at the first row sales from the

23   introduction of the Thruster through December 1995 --

24     Q.  Yes.

25     A.  -- total 1,790.

1    Q.   So the Exhibit No. 106 showed 2,000 units in that

2    period of time, and the facts showed 1,796; right?

3    A.   1,790, correct.

4    Q.   1,790.

5         Let's go back to Exhibit 106 again, please.   In

6    the year 1996, what does it show Bledsoe's sales were?

7    A.   Exhibit 106 shows Bledsoe sales as 3,437 units.

8    Q.   Going back to Exhibit 335B, what do you show as

9    the actual?

10   A.   2,407 units.

11   Q.   That's a difference of about 50 percent based

12   upon the number of actual sales that you're showing on

13   this time line Exhibit 106, 50 percent more sales than

14   actually occurred; is that correct?

15   A.   Using the 2,400 number as the basis, that would

16   be correct.

17   Q.   The 2,400 unit number is the basis because that's

18   all they sold; right?

19   A.   That's what they sold.   I was just clarifying

20   that that's as a percentage of the 2,400 as opposed to

21   as a percentage of the 3,400 difference.

22   Q.   As opposed to the percentage of the number that's

23   just a number, an estimate; right?

24   A.   I was just trying to clarify.

25   Q.   Look at the third page of Exhibit No. 106,

1    please.

2        A.   The fourth page.

3        Q.   Fourth page, I'm sorry.  That's in 1997; is that

4    right?

5        A.   Yes.

6        Q.   What does that show as Bledsoe sales?

7        A.   4,889 units.

8        Q.   And, if you go to Exhibit No. 335B and get the

9    actual number, what's that?

10       A.   3,030.

11       Q.   That's a difference of better than 50 percent;

12   correct?

13       A.   That would be a little bit more than 50 percent,

14   that's correct.

15                 THE COURT:  We'll take 15 minutes at this

16   time.

17                 (Proceedings in Recess.)

18   BY MR. HARRIS:

19       Q.   Mr. Hansen, I was asking you about -- I asked

20   you, I believe before the break, about any testing that

21   you did as of the date that that's in Exhibit 106, and I

22   think you indicated you talked to some people; is that

23   right?

24       A.   That's right.

25       Q.   Who did you talk to?

1      A.   I discussed the market share percentages with Al
2   Young and also Dean Taylor.
3      Q.   Did you do anything else to do any testing of the
4   accuracy of the data in Exhibit 106?
5      A.   As I mentioned, I compared the data in 106 to
6   actual sales to confirm that those numbers matched, and
7   also reviewed testimony of Mr. Bledsoe.
8      Q.   But you didn't do anything to compare it to
9   Bledsoe's actual sales; correct?
10     A.   No, I did compares those numbers to Bledsoe's
11  actual sales.
12            MR. HARRIS:   Could I have Exhibit 106A on
13  the screen.   I'm sorry, this is plaintiff's exhibit, I'd
14  move its admission.
15            MR. MATHIOWETZ:   No objection.
16            THE COURT:   Admitted.
17            (Exhibit Admitted.)
18  BY MR. HARRIS:
19     Q.   Would you go to the year 2000 on this.   It's the
20  third page in.
21     A.   Okay.
22     Q.   And this shows the estimated sales of Bledsoe to
23  be $7,464; correct?
24     A.   7,464 units.
25     Q.   Excuse me, units.

1    A.   That's right.

2    Q.   And, the actual, on 335B, was significantly

3  different; is that correct?

4    A.   Yes, it was significantly lower than that number.

5    Q.   Almost -- the number that was used in the market

6  allocation was almost three times the number that was

7  shown in the Exhibit 335B; is that right?

8    A.   Approximately.

9    Q.   Would you show me 335B, please.  Second page.

10        The actual sales were $2,400?  Excuse me, $2,816

11  for 2000?

12    A.   Yes.  2,816.

13    Q.   Instead of the $7,484 that's shown in the

14  information that you used to do your market allocation;

15  is that correct?

16    A.   As opposed to what was included for Bledsoe that

17  was the basis for my market share allocation.

18    Q.   Did you have any reason to believe that all of

19  the other numbers that were in that market allocation

20  were any more accurate than the numbers that were

21  assigned to Bledsoe which were off by a factor of three?

22    A.   I believe that the overall ranking of the

23  competitors was consistent, was consistently described

24  by Bledsoe and Generation II.

25    Q.   You based your opinions on the veracity of the

1    information that is contained in Exhibit 106 and 106A;

2    isn't that correct?

3        A.  I assumed that they were accurate for the

4    intended purpose.

5        Q.  And you don't have any facts that would support

6    the accuracy of those market allocation figures in

7    Exhibit 106 or 106A; isn't that correct?

8        A.  By facts, am I not supposed to include testimony

9    in that, or the Frost and Sullivan report?

10       Q.  At the time that you were deposed, you expected

11   that someone from Generation II would come in and say

12   that those numbers were accurate; didn't you?

13       A.  I believe that Generation II believes that these

14   numbers were reliable, yes.

15       Q.  The time of your deposition, sir, you thought

16   someone was going to come into this courtroom and tell

17   this jury that these numbers were accurate to support

18   your analysis; isn't that correct?

19       A.  I understood that someone from Generation II

20   would present these.

21       Q.  And that would be the factual support for the

22   conclusions that you made; is that correct?

23       A.  That would be the presentation of the creation of

24   these.

25       Q.  And what you've done is you've manipulated these

1    numbers assuming them to be true; is that right?

2       A.   For purposes of my market share analysis, I have

3    accepted this analysis as reliable for the intended

4    purpose of determining what number of sales Generation

5    II would have made but for Bledsoe's infringement.

6       Q.   And you don't know the exact support or basis for

7    all of the numbers that are contained in that schedule;

8    is that correct?

9       A.   That's correct.

10      Q.   Let's back up a little bit.  The entire effort

11   that you're trying to undergo in your market analysis

12   and in your lost profits analysis is to determine what

13   units would have been sold by Generation II?  By that, I

14   mean Generation II Canada and U.S.A. that were sold by

15   Bledsoe; is that correct?

16      A.   That's a fair statement, yes.

17      Q.   And, in order to do that, you have to understand

18   what the relevant market is; is that right?

19      A.   I agree with that.

20      Q.   You determined that the relevant market is all of

21   these braces, whether they're adjustable or not;

22   correct?

23      A.   I have included just adjustable braces in this

24   market.

25      Q.   I'm sorry, you've included whether they are

custom braces or off-the-shelf braces.  I misspoke.

A.   Yes.  My market includes both custom and off-the-shelf braces.

Q.   Did you look at what the market was for unadjustable braces?

A.   I didn't analyze unadjustable braces.

Q.   What is your understanding of Gen II's Unloader ADJ, how it works?  And, in that regard, is the user able to adjust the angle?

A.   My understanding is the user is not able to adjust the angle, but a trained clinician or orthotist would be able to adjust that in his office.

Q.   How about for all of the other off-the-shelf braces, can the user adjust those braces?

A.   I wouldn't know specifically for each brace, although I understand that they have some adjustability mechanism.

Q.   Is it usable or accessible to the user, do you know?

A.   I wouldn't know specifically for each brace.

Q.   How about for the Donjoy, let me show Exhibit No. 106, second page.  The Smith and Nephew Donjoy, where they sold 5,000 units, do you know whether that's adjustable by the user?

A.   By the patient, I don't know.

1    Q.   I assume that the patient is the user?

2    A.   Yes.

3    Q.   Isn't that important to know, when we're talking

4   about a market where people can actually go and get this

5   and use it themselves?  As contrasted with having to go

6   to the doctor to get it adjusted?

7    A.   I don't think that would be a significant factor.

8    Q.   How about price, is that a significant factor in

9   determining market?

10    A.   Price can be an issue for certain customers,

11   that's correct.

12    Q.   If you'd look down this list that's shown on

13   Exhibit 106, do you see any difference in price between

14   the custom braces and the off-the-shelf braces?

15    A.   The braces have different prices, just generally

16   speaking.

17    Q.   You don't think there's a notable difference in

18   price between the off-the-shelf and the custom braces?

19    A.   I would note that several of the custom braces

20   have a similar price to Bledsoe's off-the-shelf brace.

21   For example, the Smith and Nephew Donjoy Monarch, which

22   is a custom brace, is $500, and the Thruster is $500.

23   The Omni Align is a custom brace that's $550, so not

24   significantly different than the price of the

25   off-the-shelf brace.

1    Q.  Let's go to the fourth page of the Exhibit 106,

2  please.  Now, we've got more competitors in the market

3  in 1997; right?

4    A.  Yes, we do.

5    Q.  And the off-the-shelf braces on average, and you

6  can probably do this in your head, on average are $10

7  plus less than the custom braces; correct?

8    A.  I haven't done that calculation.

9    Q.  Can you do it in your head, or close to it?

10    A.  That would be a rough approximation.

11    Q.  And that doesn't indicate to you that those are

12  competitive markets if they have different prices like

13  that?

14    A.  It would depend.

15    Q.  No one needs a custom brace unless a doctor tells

16  them they need it; is that right?

17    A.  I believe it's up to the orthopedic surgeon, the

18  doctor, or the orthotist to determine and prescribe a

19  brace for a patient.

20    Q.  So, if a person needs a custom brace, that is

21  going to be prescribed by the orthotist, and it will not

22  be a Bledsoe brace; that correct?

23    A.  For the individuals that would require a custom

24  brace, that's correct, they would not receive a Bledsoe

25  brace.  So, therefore, those would not be included in

1   the sales that Bledsoe's actually made.

2   Q.   Is it your understanding that a doctor might

3   prescribe a custom brace for someone who didn't need a

4   custom brace?

5   A.   I understand that doctors may prescribe braces

6   based on a lot of different factors, and that certainly

7   a custom brace may provide a better fit, form and

8   function for the patient.  So there certainly are

9   situations where the patient could receive either a

10  custom or an off-the-shelf brace, and a custom brace is

11  prescribed.

12  Q.   But a patient would need a custom brace and get

13  prescribed a Bledsoe brace; is that correct.

14  A.   I think that there is a subset of patients for

15  which a custom brace would be required, and I would

16  assume that they've gotten a custom brace.

17  Q.   What was the year that that Generation II first

18  introduced an off-the-shelf brace?

19  A.   In 1997.

20  Q.   So, for the years '95 and '96, a person would

21  either be prescribed a custom brace or could use an

22  off-the-shelf brace; right?

23  A.   Are you referring specifically to whose sales?

24  Q.   A person would be prescribed a custom brace if

25  they needed a custom brace?

1    A.   In '95 and '96?

2    Q.   Yes.

3    A.   That's correct.

4    Q.   So there's no way that Bledsoe could be

5    displacing any of the sales that would otherwise go to

6    Gen II in those years?

7    A.   That's correct.  And, in those sales, the

8    customers who actually received a custom brace are not

9    included in the Bledsoe sales base.  So the sales that

10   I'm looking at that I'm trying to allocate and determine

11   what portion of those sales would have gone to

12   Generation II, those are customers who actually received

13   an off-the-shelf brace, they didn't receive a custom

14   brace.

15   Q.   I understand.  And the reason they didn't receive

16   a custom brace is because they didn't need one.  And

17   that was therefore they would not have been prescribed a

18   custom brace, and therefore Generation II didn't lose

19   those sales in 1995 and 1996; correct?

20   A.   I wouldn't agree with that.

21   Q.   This is a doctor's decision; correct?

22   A.   That's correct.

23   Q.   He looks at the patient and says you need a

24   custom brace or you can use an off-the-shelf brace;

25   correct?

1    A.   I don't believe they make a determination in that

2    fashion.  They make a determination as to what brace

3    would work and be efficacious for the treatment of that

4    patient.  If we remove the Bledsoe brace from the

5    market, some of those folks would have been prescribed,

6    I think it's very reasonable, a Generation II brace.

7    Q.   In 1995 and 1996, when other off-the-shelf braces

8    were available?

9    A.   That's correct.

10    Q.   Including the Donjoy brace?

11    A.   Yes.

12    Q.   What's the basis for your making an assumption

13    that somehow somebody who didn't need a custom brace

14    would be prescribed a custom brace in '95 and '96?

15    A.   My understanding is that the brace, the braces,

16    are prescribed based on fit and function.  To the extent

17    that a patient could have received a Bledsoe brace, if

18    that's off the market, off-the-shelf brace from another

19    manufacturer, may not have been suitable for that

20    person.

21    Q.   But, if they did receive a Bledsoe brace, they

22    didn't need a custom brace because the orthotist decided

23    they didn't need it; right?

24    A.   I would say that the orthotist decided that the

25    Bledsoe brace was appropriate for that patient and did

1   not make a determination that a custom brace would not

2   be appropriate for that person.

3       Q.   Is this patient at all influenced by insurance?

4       A.   Insurance, reimbursement rates may have an

5   impact.

6       Q.   And that is the insurance companies want to pay

7   as little as possible?

8       A.   I think the insurance companies want to minimize

9   their costs, yet prescribing a brace or a plan for a

10  brace that works and delays surgeries and those major

11  expenses, that would have been a consideration for them

12  as well.

13      Q.   They'd defer that to the doctor then; is that

14  correct?

15      A.   I believe they would defer that to the doctor.

16      Q.   So what impact does insurance and insurance

17  reimbursements have?

18      A.   For certain patients, they may be subject to

19  limitations in coverage; and, for those patients, I

20  believe cost would be a factor that they would consider.

21      Q.   Do you have any understanding of what the

22  relative amounts of reimbursement are between a custom

23  brace and an off-the-shelf brace?

24      A.   Generally.

25      Q.   What are those reimbursement rates that you

1   understand?

2      A.   And this is from my recollection, but that the

3   off-the-shelf brace, the reimbursement would range

4   generally from 700 to $800, and the reimbursement for a

5   custom brace would be more.   Anywhere in the

6   neighborhood of $1,100 or $1,200.

7      Q.   1,100 to 1,400, I think is that what you said in

8   your deposition?

9      A.   I don't remember specifically, but that sounds

10   reasonable.

11      Q.   So that an orthotist, by prescribing a custom

12   brace, could make more money; right?

13      A.   There would be that potentiality.

14      Q.   So there's nothing that would dissuade an

15   orthotist if he was presented with a Bledsoe brace and a

16   custom ADJ brace, his financial incentive is to

17   prescribe the ADJ; right?

18      A.   I think it would vary from orthotist to

19   orthotist.

20      Q.   His financial incentive would vary from orthotist

21   to orthotist?

22      A.   The actual profits that the orthotist earns on

23   the distribution and sale of each of these braces would

24   vary.

25      Q.   You got the information on competitors from Mr.

1   Mathiowetz, this information in 105 and 106A?

2      A.   The documents were -- I don't recall exactly who

3   provided them to me.  They may have come through

4   counsel.  But I understood they were prepared by

5   Generation II.

6      Q.   Your deposition on page 43, line 4 --

7      A.   October 24th?

8      Q.   I'm sorry, yes, October 24.

9      A.   I'm sorry, page 43.

10     Q.   Yeah.  I think we paginated it all the way

11  through.

12     A.   Okay.

13     Q.   Line 4, question, The document says OA

14  competition competitors January 1998 to June 2003, which

15  is the Exhibit 106A, I would have to look at the

16  specific document, where did you get it is the question.

17  That would have been provided by counsel.  Was that the

18  answer you gave?

19     A.   Yes.

20     Q.   You met with people at Generation II.  Did you

21  meet with them physically, personally?

22     A.   I met with people from Generation II Orthotics.

23     Q.   That would be Mr. Taylor, Dean and Lance?

24     A.   That's correct.

25     Q.   And when was that meeting?

1    A.   I don't recall a specific date, but that's before

2    the report was filed in 1998.

3    Q.   Since that time, did you meet with anybody at

4    Generation II up to the time of your deposition?

5    A.   Not in person.

6    Q.   You had phone conversations with people from

7    Generation II; is that correct?

8    A.   That's correct.

9    Q.   And did you take any notes of those

10   conversations?

11   A.   I had taken notes of various conversations.

12   Q.   Isn't it a fact that all the notes that you took

13   of conversations that you had consisted of four pages?

14   A.   That's correct.

15   Q.   And that three of those pages happened on October

16   22nd and October 23rd of 2003; is that correct?

17   A.   For the conversations that I had notes of, that's

18   correct.

19   Q.   Isn't it your practice to keep notes of

20   conversations over a ten year period of engagement?

21   A.   It would depend.

22   Q.   Sometimes you would, sometimes you wouldn't?

23   A.   Yes.

24   Q.   And you had one page of notes which you testified

25   originally in your depositions was made in 2002; is that

correct?

A.   That's correct.  It related to a conversation in 2002.

Q.   And I asked you three times when those notes were made, and you insisted each time that it was in 2002; is that correct?

A.   My response was that I believed that they were from 2002.

Q.   And it wasn't until I pointed out to you that that note had information that was only available in the summer of 2003 that you realized and recanted that testimony; is that correct?

A.   When we pointed that information out, I did realize and acknowledge that those notes were not notes that I had taken contemporaneously in 2002 and that those would have been written at a later date.

Q.   So, more than a year later, you recalled a conversation that you had a year before and wrote notes about it and put it in your file; is that correct?

A.   Before I filed my report in 2003, I received updated market share information.  And, in connection with taking the updated information, comparing it to the information I had in 2002, I wrote notes related to my understanding related to 2002.  I don't recall if I still had my 2002 notes, original notes, but the notes

that I wrote before my report in 2003 reflect the
substance of that conversation, and I added a notation
to basically explain the calculation of what was
happening in the 2003 updated information.

Q.   Just so I'm following you, you wrote in 2002
notes of a conversation you had -- excuse me -- you
wrote notes in 2003, notes of a conversation you had in
2003, and put it in your file?

A.   It was a summary of a conversation in 2002.

Q.   That was a conversation you had with a Mr.
Massero; is that right?

A.   That's correct.

Q.   And that's a name we haven't heard in these
proceedings.  Who is Mr. Massero?

A.   Mr. Massero is a Generation II U.S.A. employee.

Q.   And he was the guy who gave you the documents
which are in Exhibit 106A; is that correct?

A.   Again, I wasn't provided with these directly from
Mr. Massero, but I understood that Mr. Massero
participated in the creation of this, along with
assistance from Al Young.

Q.   I'd like to refer to your deposition, page 76, on
line 8, Which documents are those then that he prepared,
he refers to Mr. Massero.  Answer, Those would be market
share summaries for the period '98, '99, 2000, 2001,

1  2002, and an update for 2003 January through June.  Did

2  these become part of your report?  The answer is yes.

3  So these are the documents that we've been talking

4  about?

5      A.   That's correct.

6      Q.   That you got from Mr. Massero?

7      A.   That Mr. Massero prepared.

8      Q.   Have you ever met Mr. Massero?

9      A.   Not in person.

10     Q.   You understand that Bledsoe is contending that

11 there is a market for custom adjustable braces and there

12 is a market for off-the-shelf adjustable braces; is that

13 your understanding?

14     A.   Yes, I do understand that.

15     Q.   And one of the things that they point to is a

16 statement in the 1997 annual report of Generation II

17 U.S.A. -- excuse me -- business plan of Generation II

18 U.S.A.?

19     A.   Yes, business plan.

20     Q.   Where Generation II states that they, during

21 1997, intend to enter the market, enter the OTS market;

22 is that correct?

23     A.   In that market share report or business plan,

24 they use the term custom market and off-the-shelf

25 market.  However, on numerous occasions throughout that

1  document, they refer to the market as the OA brace

2  market on a combined basis.  So they've used that term

3  market somewhat loosely in that document.

4     Q.  And, prior to 1997, they did not have a product

5  in the OTS market; correct?

6     A.  Prior to 1997, they did not offer an

7  off-the-shelf product for sale.

8     Q.  And, to your knowledge, there has been no finding

9  of infringement by any Donjoy products on the '169 or

10  '806 patents; correct?

11     A.  I don't believe there's been a judicial

12  proceeding to find --

13     Q.  You've reviewed the agreement between Donjoy and

14  Gen II; right?

15     A.  Yes.

16     Q.  And, in that agreement, the parties agree that

17  Donjoy is -- in making that agreement, not admitting

18  infringement or admitting that the patent was valid,

19  patents are valid; is that correct?

20     A.  That's correct.  Fairly standard language is

21  included in there.

22     Q.  So the issue of whether Donjoy is an infringing

23  product has not been determined; correct?

24     A.  My understanding is that it is an infringing

25  product, they took a license to the patents, they were

1    willing to pay $4 million for that license.  I

2    understood that the Generation II individuals as well as

3    the expert with respect to technical issues reviewed the

4    Donjoy product and believed that it infringes the

5    patents and sued.

6      Q.  Donjoy was being sued by Generation II at the

7    time that agreement was entered into; correct?

8      A.  Yes, they had been sued for infringement for '169

9    and '806 patents.

10     Q.  And there was no judgment entered in that case?

11   It was settled without a finding of infringement;

12   correct?

13     A.  There was no judicial resolution.

14     Q.  So the parties were left with their contentions,

15   Gen II contends that the Donjoy product infringes, but

16   there's been no determination that it does; correct?

17     A.  No legal determination, that's correct.

18             MR. HARRIS:  May I approach the witness,

19   Your Honor?

20             THE COURT:  Yes.

21             MR. HARRIS:  I've put before the witness

22   Exhibit 335 -- A188.  Exhibit A188, which is a

23   demonstrative exhibit, being offered by the defendant.

24   And I offer it at this time.

25             MR. BUNSOW:  That's not on our exhibit list.

1            MR. HARRIS :  It was a recently prepared

2    exhibit, Your Honor, in response to his report.

3            MR. BUNSOW:  May I see a copy of it?

4            MR. HARRIS:  I gave it to you, it's on the

5    desk right there.

6            MR. BUNSOW:  This appears to be some altered

7    chart, I'm not sure what it is.

8            THE COURT:  Was it in the pretrial order?

9            MR. HARRIS:  It was not in the pretrial

10   order.

11           THE COURT:  The objection is sustained.

12           MR. HARRIS:  Your Honor, might I be heard at

13   side bar?

14           THE COURT:  No.

15   BY MR. HARRIS:

16     Q.  Would you turn to Exhibit 335B.

17     A.  Is that an exhibit I have up here?

18     Q.  No, I'm sorry.  It may be one of the exhibits you

19   have up there.  I think it is, as a matter of fact.

20     A.  I'm sorry, could you repeat the number.

21     Q.  335B, it starts with a sheet which was attachment

22   4 to your report.

23           MR. HARRIS:  May I approach, Your Honor?

24           THE COURT:  Yes.

25   BY MR. HARRIS:

1      Q.   Do you recognizes 335B?

2      A.   335B appears to be the attachments to my expert

3  report.

4      Q.   I think it's already in.

5           MR. HARRIS:   335, I think we were referring

6  to it.

7           THE COURT:   It is in.

8           MR. HARRIS:   Thank you.

9  BY MR. HARRIS:

10     Q.   Looking at the first page of attachment 7, which

11  is about fourth or fifth page in, sixth page in, this is

12  a market allocation analysis that you did; is that

13  correct?

14     A.   Yes.

15     Q.   Using the information which you got from Mr.

16  Massero after 1998 and before that from somebody; right?

17     A.   That's correct.

18     Q.   And this document shows what are custom and what

19  are OTS braces; is that correct?

20     A.   That information is provided on the summary.

21     Q.   And a person could go through this document and

22  cross out all the information relating to custom braces,

23  and you could from this document calculate the number of

24  OTS braces that were sold and the percentage of the OTS

25  market by itself of each of the participants that are

1    listed; is that correct?

2        A.   That could be done.

3        Q.   And, from that information, you could take and

4    determine the percentage of the market, the OTS market,

5    that Generation II had achieved in any particular year;

6    is that correct?

7        A.   If you wanted to break the market into two

8    separate markets, you could do that calculation.

9        Q.   That would be the effect of doing that

10   calculation, would be to treat the OTS market as a

11   separate market; correct?

12       A.   That's correct.

13       Q.   And that would -- so, in this instance, you could

14   eliminate all the information except the information on

15   those last two in 1995, the two OTS competitors;

16   correct?

17       A.   You're asking me if you eliminate all of the

18   custom braces?

19       Q.   Yes.

20       A.   Yes.  You would be left with the ones designated

21   OTS.

22       Q.   Your understanding is that's an accurate

23   designation so that would give you the entire OTS market

24   in as far as Generation II understood it in 1995;

25   correct?

1      A.   That's correct.

2      Q.   And you could do that, you could allocate then 50

3    percent to each of those players, zero percent to

4    Generation II; correct?

5      A.   If you wanted to look at it on that basis, you

6    could do that.

7      Q.   I'm just trying to determine the information

8    that's here would be sufficient to allow you to do that

9    calculation; correct?

10     A.   Yes, you could.

11     Q.   And, once you had done that, let's take a year

12   that's a little bit more -- go down to 1997, which is

13   lower down on the page, it's a little more interesting

14   because there are more OTS people.  But you could

15   eliminate, for example -- you could just highlight

16   those, and you could total the number of units each of

17   those players had, and determine the percentage of the

18   OTS market that each of those people had; correct?

19     A.   You could perform that calculation, that's

20   correct.

21     Q.   Once you had done that, you could determine the

22   percentage of the market that Generation II had;

23   correct?

24     A.   If you wanted to break the market into OTS and

25   custom, you could do that.

1    Q.   Don't you understand that that's what Bledsoe

2    thinks is appropriate?

3    A.   I understand that.

4    Q.   So, if you wanted to do what Bledsoe thinks was

5    appropriate, you would break the market up into those

6    two halves; correct?

7    A.   You could break it up in that fashion.

8    Q.   And, if you did that, you could then go to

9    another sheet that's in your document here, that would

10   be page No. 3, and you could, for each of the years here

11   shown, that shows the Bledsoe units, go to the third

12   page of Exhibit 335, it shows the Bledsoe, it shows the

13   Bledsoe units right there, and it shows the percentages,

14   and you could derive the percentage that Generation II

15   had in each year of that market and put it in this

16   column right here; right?

17   A.   In the second column, you could.

18   Q.   In the second column.  You could put the

19   percentages in that second column; right?

20   A.   You could do that calculation, that's correct.

21   Q.   Just based on the information that's in your

22   report; right?

23   A.   Yes.

24   Q.   And, if you multiply that percentage times the

25   Bledsoe units, would you get the percentage -- you'd get

1  the number of units sold in the OTS market that

2  Generation II would have sold in the OTS market using

3  your market allocation assumptions; correct?

4      A.   Assuming that's a separate market, one could do

5  that.

6      Q.   And, once you did that, you could come up with

7  the total number of units during the period, come up

8  with that total number of units of 6,723 units that

9  you've got.  Now, would it be something -- more likely

10 be some other number if you just did the OTS market;

11 correct?

12     A.   That's correct.

13     Q.   Could you then do the rest of the analysis and

14 calculate the lost profits in exactly the same way you

15 did it using that number; is that right?

16     A.   There would be some adjustments to the allocation

17 of the Generation II sales assuming that you are taking

18 the position that only OTS braces would have been sold.

19     Q.   That's the position that Bledsoe is taking --

20          THE COURT:  Mr. Harris, we've been through

21 that.

22          MR. HARRIS:  Got it.

23 BY MR. HARRIS:

24     Q.   But there is nothing that isn't contained in

25 these portions of your report, Exhibit 335B?  You

1  wouldn't have to go anywhere else to do that

2  calculation; is that correct?

3      A.   That's correct.   There would be some adjustments,

4  but the basis would be in the schedules.

5      Q.   One of the adjustments would be that, for any

6  units that you didn't claim lost profits, you would have

7  a royalty claim; is that correct?

8      A.   That's one of the adjustments.

9      Q.   What other adjustments?

10     A.   When allocating the sales amongst Generation II's

11 would have been sales, you would eliminate the custom

12 braces if you're just focusing on the off-the-shelf

13 market for purposes of pricing out Generation II's lost

14 profits.   And that would also impact or effect

15 Generation II Orthotics' lost profits.

16     Q.   It would be a matter of doing the math, though;

17 isn't that correct?

18     A.   You would change the calculations and formulas;

19 that is correct.

20     Q.   You would not change the methodology in a single

21 way; is that correct?

22     A.   Well, generally, I would agree with that.   It's

23 definitional.

24     Q.   What do you understand to be the feature of the

25 patented devise that would be the subject of the

1  reasonable royalty negotiation?

2      A.   The reasonable royalty would grant rights to the

3  '169 and '806 patents, and it would be unrestricted use

4  of those for any and all features or functionality

5  that's embodied in those patents.

6      Q.   In order to do the proper reasonable royalty

7  negotiation, don't you have to identify what feature it

8  is that the customers want?

9      A.   You would determine was what being licensed,

10 that's correct.

11     Q.   And what it was about was what being licensed

12 that made it more valuable in the market; right?

13     A.   I would agree with that.

14     Q.   Now, when Generation II added the adjustment

15 element to the Unloader, it increased the price of the

16 Unloader; correct?

17     A.   There was a price increase from the Unloader to

18 the Unloader ADJ.

19     Q.   Show me Exhibit 106, please, and look at the

20 fourth page.  Second page.  This is the custom

21 nonadjustable, this is the custom adjustable.  The price

22 went up by what, $39?

23     A.   $36.

24     Q.   $36.  Is that the value of the adjustment

25 feature?

1    A.   I don't believe that that would necessarily

2  represent or reflect the value of the adjustment

3  feature.

4    Q.   Isn't that an analysis of what Generation II

5  thought it was at that time?

6    A.   No.   That's a change in price.

7    Q.   Doesn't price reflect perceived value by the

8  customer.

9         THE COURT:   Mr. Harris, we're beyond the

10  scope of direct.

11        MR. HARRIS:   Sorry.

12  BY MR. HARRIS:

13    Q.   Reasonable royalty negotiations are hypothetical

14  negotiations; right?

15    A.   That's correct.

16    Q.   And those hypothetical negotiations occur before

17  Bledsoe entered the market; correct?

18    A.   They take place on the date of the first

19  infringement assuming that a patent has been issued.

20    Q.   In this instance, you started it when Bledsoe

21  entered the market; was that correct?

22    A.   I started in March of 1995, which coincides with

23  the date at which Bledsoe began commercial sales of the

24  Thruster, and is also the date of one of the

25  patents-in-suit issuing.

1    Q.   Does infringement actually begin on the date of

2    first manufacture of a patented device?

3    A.   My understanding is that the manufacture of a

4    product, if that product is accused to infringe in that

5    form, could also constitute infringement.

6    Q.   But you chose to use March?

7    A.   Assuming a patent was issued, it could constitute

8    infringement.  So, yes, I did use March.

9    Q.   But it could have been earlier; right?

10   A.   To the extent that there were infringing

11   activities before March, one could argue that that date

12   would be moved earlier.

13   Q.   Well, they manufactured the product for purposes

14   of sale before March, because they showed it in March;

15   correct?

16   A.   That's correct.  Although, you would have to have

17   an issued patent to have infringement.

18   Q.   Part of the negotiations is that the person is

19   not already in the market at the time that they have

20   entered into these negotiations; correct?

21   A.   That they --

22   Q.   If they're not already in the market?

23   A.   It's the date of first infringement.  So, whether

24   that's manufacture or first sale, it would be before

25   they made their initial sales of the product.

1    Q.   At that time, they have a choice to make, they

2  can either going into the market and expose themself to

3  infringement damages, or they can choose not to because

4  it was going to cost them a lot to get into the market;

5  is that correct?

6    A.   That's something that they could consider.

7  Although, in certain circumstances, companies will have

8  already expended a significant amount of moneys, time

9  and effort before the date of the first infringement,

10  and those would be a consideration.

11    Q.   Now, you indicated, I believe, that it's the

12  demand for the patented attribute and not the demand for

13  the product that you look at in doing this negotiation;

14  correct?

15    A.   That's correct.  The Panduit decision itself

16  actually states demand for the patented product,

17  although I generally interpret that to mean demand for

18  the invention.

19    Q.   The invention.  And the invention here you

20  understood was what?

21    A.   I understood that it was a joint to be used in an

22  OA knee brace that was easily adjustable.

23    Q.   Now, you're aware of the Aligner as a

24  non-infringing alternative; correct?

25    A.   That's correct.

1    Q.   And, if the Aligner was available as a

2  noninfringing alternative, do you know what the

3  differences were between the Aligner and the brace that

4  Bledsoe is accused of infringing on, the Thruster?

5    A.   Technically, I couldn't answer that question.

6    Q.   If I told you that the testimony has been that it

7  was whether the brace had one hinge or two hinges, would

8  that be new information to you?

9    A.   I don't recall specifically whether -- I know

10  there are some braces that have one hinge versus two

11  hinges.

12    Q.   Do you have any opinion about how the market

13  would value the second hinge if that was the difference

14  between the accused devices and a noninfringing

15  alternative?

16    A.   I haven't studied that.

17    Q.   Wouldn't you have to do that in order to conduct

18  this hypothetical negotiation?

19    A.   I don't believe so.

20    Q.   What's the rule of thumb?

21    A.   The rule of thumb is something that is referred

22  to in licensing negotiations, and the rule of thumb

23  essentially states that one could pay 25 percent of its

24  operating profit as reasonable royalty.  And that's a

25  benchmark that could be calculated under that rule.

1    Q.   And you determined that a calculation under the

2    rule of thumb would yield a royalty in this case of 7.5

3    percent; is that correct?

4    A.   I did not apply the rule of thumb.  That was not

5    one of the metrics that I chose to use or found to be

6    reliable.  But you did ask me in deposition to calculate

7    that for the Thruster, and it was 7.5 percent was the

8    rate that I had calculated.

9    Q.   And you indicated, I believe, that you estimated

10   Bledsoe's operating profits because you couldn't

11   calculate them; is that correct?

12   A.   Again, I was in my deposition, I didn't take the

13   time to go through and perform a specific calculation,

14   so I didn't perform an estimate at that time.

15   Q.   And the reason you couldn't calculate Bledsoe's

16   operating profits on the infringing or allegedly

17   infringing devices was because Bledsoe didn't maintain

18   its records in a product line basis; is that right?

19   A.   Bledsoe did not maintain what's referred to as a

20   product line profit and loss statement.  However, I

21   would have been able to, where I could, calculate

22   operating profits for the Thruster.  That is something

23   that can be done.

24   Q.   You did calculate operating profits, and came to

25   about 30 percent; is that right?

1    A.   Roughly.

2    Q.   And how did that 30 percent compare to the

3    operating profits of Generation II on its product, the

4    Adjustor, Unloading Adjustor?

5    A.   I didn't specifically analyze or calculate

6    Generation II's operating profits.

7    Q.   I thought one of the slides that you presented

8    earlier this morning indicated that Bledsoe could

9    realize a profit of 22 percent more than Generation II.

10   A.   No.  That slide indicated that Bledsoe earned 22

11   and a half percent higher profits on its sales of the

12   Thruster brace compared to all of the other Bledsoe

13   products.  So it's a comparison of profit improvement

14   that Bledsoe realizes by selling the Thruster.

15   Q.   I misunderstood, I'm sorry.

16        So you reject the application of rule of thumb of

17   the negotiations; is that right?

18   A.   I think that the rule of thumb provides a metric.

19   However, it is I believe in most situations, much less

20   reliable than the actual financial information for the

21   products in suit.

22   Q.   Are you familiar with a process of reconstructing

23   these negotiations by applying the rule of thumb and

24   either going up or down from the result of rule of thumb

25   based on the Georgia Pacific factors?

1      A.   Someone could do an analysis like that.

2      Q.   That's never been anything that's happened in

3   your experience, though; is that right?

4      A.   Not that I recall.  Generally, I don't subscribe

5   to the rule of thumb.

6      Q.   If we're doing it at a time when Bledsoe hasn't

7   entered the market, you do believe that any costs that

8   Bledsoe would incur in entering the market would

9   influence the royalty; is that correct?

10      A.   To the extent there were costs that would be

11   required to enter the market, I think those are -- it's

12   reasonable that Bledsoe would consider those costs.

13      Q.   And, if those costs were high, Bledsoe would

14   offer a lower royalty; is that correct?

15      A.   Well, that could be one result.  I think that you

16   would need to compare the costs to enter the market

17   utilizing the patent infringement to the costs of an

18   invention that wouldn't utilize the patents.  Because

19   you're always going to have costs associated with

20   entering any market.

21      Q.   You indicated, I believe, that you were aware of

22   no other licenses that Generation II had issued to

23   licensees of its patented products other than the

24   license that it issued to Generation II U.S.A.?

25      A.   I've reviewed the Generation II U.S.A. agreements

1   as well as an agreement with Sport Mate in Canada.

2      Q.   And, unfortunately, the Sport Mate agreement

3   provide for a 2 percent royalty; correct?

4      A.   That's not correct.

5      Q.   The document, is there anything confusing about

6   the document itself that would prevent the jury from

7   reading and understanding it in their opinion?

8      A.   As long as they're provided with the appendix

9   which specifically identifies three separate components

10  of the royalty, I think one could read that and draw

11  that conclusion.  Although, there may be some math or

12  interpretation of the appendix.

13     Q.   The Donjoy royalty amount was $4 million; is that

14  correct?

15     A.   That's correct.

16     Q.   And that was a one-time one payment, they're

17  excused from any problems in the past, as long as they

18  want to sell the products that are listed in the future;

19  correct?

20     A.   Correct.  It's a lump sum paid-up royalty.

21     Q.   Have you done an analysis by dividing the number

22  of Donjoy units into the $4 million to determine what

23  percentage of royalty that works out to be?

24     A.   I've generally looked at that.

25     Q.   And what did you find?

A.   Just basing the analysis on the historical Donjoy

sales, which was the information that Generation II

provided, so this would be based on Generation II's

belief as to how many Donjoy sales were made, that would

calculate out to an effective royalty rate based on the

historical analysis of a little bit over 15 percent.

Q.   That was not a calculation you had done at the

time of your deposition when I asked you that; is that

correct?

A.   That's correct.

Q.   You never even reviewed the Donjoy agreement at

that time; is that correct?

A.   That's not correct.

Q.   Oh, you had reviewed it but not made the

calculation?

A.   That's correct.

Q.   So it's your opinion the Donjoy agreed to a 15

percent royalty for a limited license?

A.   No.  My opinion is they paid $4 million for

limited use rights to the patents-in-suit.  15 percent

is in response to your question.

Q.   That you had done a calculation to determine what

it would work out to be?

            THE COURT:  He's answered the question, Mr.

Harris.

1          MR. HARRIS:   Thank you, Your Honor.

2     BY MR. HARRIS:

3     Q.   You did a calculation where you said that

4     Generation II owed a $104 royalty U.S.A. to Generation

5     II Canada on a per unit basis; right?

6     A.   That's correct.

7     Q.   But they could pay that royalty in essence by

8     buying a hinge from Generation II Canada; correct?

9     A.   They were to receive a credit against the

10    royalties due for every hinge that they bought for $104

11    Canadian.

12    Q.   And that was how they paid it, was to buy the

13    hinges; is that correct?

14    A.   That's what actually happened.

15    Q.   And, when they bought the hinges, they actually

16    got a hinge; correct?

17    A.   Yes.

18    Q.   So that the net payment of a royalty on the hinge

19    was the difference between what the hinge cost and

20    whatever they had to pay to Generation II Canada;

21    correct?

22    A.   That's correct.  They avoided -- by purchasing

23    the hinge from Generation II Orthotics, they avoided the

24    additional cost of acquiring the hinge from another

25    party.

1    Q.   So what they -- in fact, the net royalty payment,

2    because you look at the economics of both sides, the net

3    receipt of Generation II Orthotics was $79; correct?

4    A.   That would be about right.

5    Q.   And that's Canadian; correct?

6    A.   Yes.

7    Q.   And so you have to reduce that down to make it

8    into U.S. dollars in order to be able to compare it to

9    the sales price of the Generation II product; correct?

10   A.   You could do that.  You could certainly look at

11   that two ways.  As $104 Canadian, which is what they

12   were obligated to pay for every brace that they sold,

13   irrespective of where the hinge came from, so that was

14   the royalty term.  In actuality, they purchased a hinge,

15   so they received some value, and that would be a deduct

16   to the $104, which would result in a payment of

17   approximately $79 Canadian as a royalty.

18   Q.   And, when you calculated the lost royalties, you

19   didn't adjust that payment -- let me look at your

20   exhibit here -- it's Exhibit 328 of the exhibits that

21   were handed to you by Mr. Mathiowetz.  Do you have that?

22   A.   Yes.

23   Q.   In the middle column there, you show a royalty

24   per unit of $75.  In fact, that's $75 Canadian; correct?

25   A.   No.  What's shown on this sheet is $75 U.S.  I

1   started on this schedule with $104 Canadian, which is

2   the specific royalty term in the agreement, and

3   converted that to U.S. dollars.  So this is $75 U.S.,

4   not Canadian.

5       Q.   But, for this $75 U.S. they got a hinge, too;

6   right?

7       A.   That's correct.

8       Q.   So this is not the exact royalty payment.  The

9   royalty payment was significantly less than that because

10  they got a hinge which had a value of $25 Canadian;

11  correct?

12      A.   You could look at it that way.

13      Q.   If you look at it that way, and take -- this nets

14  out to be about $52 U.S; correct?

15      A.   It would be in the low 50s.

16      Q.   Okay.  And, if you take $52 and compare it to the

17  $625 price of the Gen II Unloader, what do you get?

18      A.   One second, please.

19              (Pause in Proceedings.)

20  BY MR. HARRIS:

21      A.   First, it would be $57, not $52.

22      Q.   Okay.  $57 compared to the $625, what percentage

23  is that royalty?

24      A.   As a percentage of $625, that would be slightly

25  above nine percent.

1    Q.  Slightly above nine?

2    A.  Yes.

3    Q.  Thank you.

4        So that's what a related company agreed to pay?

5    A.  That's the term in the Generation II U.S.A.

6    Generation II Orthotics agreement.

7            MR. HARRIS:  I don't have any further

8    questions, thank you.

9            THE COURT:  Any redirect?

10           REDIRECT EXAMINATION

11   BY MR. MATHIOWETZ:

12   Q.  Mr. Hansen, counsel referred to the fact that you

13   had -- you've been involved in several reports between

14   the time you first got involved in this case and the

15   present.  Would you agree that there have been some

16   substantial changes in the marketplace between the time

17   of your first report and the most recent report?

18   A.  I would agree that the market has continued to

19   evolve and expand.

20   Q.  Now, a lot of questions were asked regarding

21   overestimation of sales in Exhibit 106.  In particular,

22   the over estimation of Bledsoe sales.  Did that

23   overestimation of Bledsoe sales have any impact on your

24   market share analysis?

25   A.  No, it did not.

1    Q.   Why not?

2    A.   As I testified to earlier, in preparing the

3    market share analysis, I removed the Bledsoe sales from

4    the market.  So, to the extent those are overestimated

5    by Generation II, that would not impact the resulting

6    market share calculation.  When I went to determine how

7    many of Bledsoe's sales have been met by Generation II,

8    I used the actual Bledsoe sales, not the estimate

9    provided by Generation II.

10   Q.   So that 20 minutes or so of questioning about

11   Bledsoe's over-estimation of Bledsoe sales is

12   irrelevant; is that correct?

13   A.   It doesn't affect the calculation of Generation

14   II's market share.

15   Q.   Now, there was also reference to the fact that in

16   the very first report there was a claim for lost profits

17   in all sales.  And, in your second report, in the second

18   report, you had alternatives of either lost profits or

19   market share analysis.  When you go from lost profits on

20   all sales to a market share analysis, what effect does

21   that have on the overall damages?

22   A.   That decreases the lost profits damages.

23   Q.   So, in other words, the damage number comes down

24   rather than goes up; isn't that right?

25   A.   That's correct.

1    Q.  So it becomes a more conservative estimate rather

2    than what you had before?

3    A.  It becomes a lower quantification of damages.

4    Q.  You mentioned in your testimony earlier that you

5    relied on the Frost and Sullivan report for 2001.  How

6    did the market share analysis done by Frost and Sullivan

7    compared with the market share analysis which had been

8    done by Generation II?

9    A.  The market share analysis in Frost and Sullivan

10   was very similar to Generation II.  There were a couple

11   of differences.  In Frost and Sullivan, Generation II

12   was estimated to have a 45 percent market share.  And

13   Bledsoe so was estimated to have just a 6 percent market

14   share.  For the other major competitors, they were all

15   within 1 percent of the -- the Generation II's numbers

16   where within two percent of the Frost and Sullivan

17   numbers.  So, in essence, Generation II, in their own

18   analysis, underestimated their market share and

19   overestimated the market share of Bledsoe.

20   Q.  So Generation II underestimated their own market

21   share?

22   A.  In comparison to Frost and Sullivan, the industry

23   report.

24   Q.  Now there was also a question about difference,

25   differences in price between off-the-shelf and custom

1    braces.   Does the reimbursement by an insurance company

2    result in making that somewhat of a meaningless

3    distinction in a lot of cases?

4         A.   I'm not certain I understand your question.

5         Q.   Well, so if whether there's reimbursement

6    involved by insurance companies, the difference between

7    -- in price between an off-the-shelf and a custom brace

8    dose not have as much significance, would you agree with

9    that?

10        A.   I would agree with that.   Generally, when you're

11   looking at the issue of price, it's the price that the

12   end user is going to pay.   Since these are reimbursed

13   through an insurance, that's not a consideration for the

14   patient.

15        Q.   Now, Bledsoe's counsel asked you why an orthotist

16   would fit a custom brace in lieu of a Bledsoe

17   off-the-shelf brace.   Now, if that orthotist was

18   prescribing the Bledsoe brace because it had the

19   adjustability feature, what other options would he have

20   had, he or she have had, if the Bledsoe brace was no

21   longer available to them?

22        A.   If that was the particular feature that caused

23   them to prescribe that brace or distribute that brace,

24   they would have had the Generation II braces and

25   potentially the Donjoy braces as available alternatives.

1    Q.  So, the fact that it was in that circumstance,

2  whether or not it was custom versus off-the-shelf, is

3  not really the right distinction; is that correct?

4    A.  That's correct.

5           MR. MATHIOWETZ:  I have no further

6  questions.

7           MR. HARRIS:  I have a couple of questions.

8                  RECROSS EXAMINATION

9  BY MR. HARRIS:

10   Q.  In looking at the numbers, the only numbers we

11  had we knew were accurate were the Bledsoe numbers in

12  looking at the projection of the market allocation; is

13  that correct?  I'm sorry, the Generation II and the

14  Bledsoe numbers were the only numbers we had; right?

15   A.  Those were the only parties in this suit that

16  provided actual sales data.

17   Q.  That had actual sales data in showing you the

18  Bledsoe numbers were grossly overstated.  Does that call

19  into question the numbers for the other competitors as

20  well?

21   A.  I think that the numbers for the other

22  competitors appeared reasonable.

23   Q.  Appeared reasonable, but you don't know anything

24  about the market; correct?

25   A.  I know about the market from my reading documents

1    and information in this case and discussions with

2    Generation II people and also reviewing deposition

3    transcripts.

4        Q.   And you've indicated, I think in response to Mr.

5    Mathiowetz's question, that you'd used the Frost and

6    Sullivan report to verify these numbers when he did the

7    reports; is that right?

8        A.   No.

9        Q.   In fact, you didn't have the Frost and Sullivan

10   report even in 2003 after you'd already done three

11   reports; correct?

12       A.   The Frost and Sullivan report was not available

13   to me at that point.

14       Q.   So you didn't have it, and you didn't use it when

15   you put these numbers on these pages that you've shown

16   here to the jury; correct?

17       A.   That's correct.

18              MR. HARRIS:   Thank you.

19              THE COURT:   All right.   You may step down.

20              THE WITNESS:   Thank you.

21              MR. BUNSOW:   Plaintiff rests, Your Honor.

22              THE COURT:   All right.

23              MR. HARDIN:   Your Honor, we do have a motion

24   we would make at this time, if the Court would hear it.

25              THE COURT:   Let's consider the motions have

1   been made, we'll deal with it later.

2              MR. HARDIN:  Bledsoe Brace would call as its

3   first witness, Dr. Edward Grood.

4              EDWARD GROOD, being duly sworn, testified as

5   follows:

6              THE CLERK:  State your full name and spell

7   your last name.

8              THE WITNESS:  My name is Edward S. Grood,

9   that's spelled G-R-O-O-D, as in David.

10                     DIRECT EXAMINATION

11  BY MR. HARDIN:

12     Q.  Good morning, Dr. Grood.

13     A.  Good morning.

14     Q.  Would you please tell the jury a little bit about

15  yourself, where you went to undergraduate and graduate

16  school, and your present employment.

17     A.  I have an undergraduate degree in physics from

18  Rensselaer Polytechnic Institute, and I went to graduate

19  school at the State University of New York at Buffalo

20  and got degrees in mechanical engineering.  And I'm

21  currently Director of Undergraduate Studies for the

22  program for the Department of Biomedical Engineering at

23  the University of Cincinnati.

24     Q.  How long have you been at the University of

25  Cincinnati, Doctor?

1     A.   Since 1975.

2     Q.   And between -- what was your Ph.D., when did you

3  receive that?

4     A.   It was mechanical engineering with a dissertation

5  in bioengineering.

6     Q.   And you had received that in what year?

7     A.   1972.  Actually, '73, the degree was awarded.

8     Q.   And, at that time, did that -- did any of your

9  doctoral studies include any biomechanics?

10     A.   Just related to the heart.

11     Q.   The heart.

12     A.   Yes.

13     Q.   Did there come a time in your career, Doctor,

14  that your studies turned towards biomechanics, in

15  particular joints and bones?

16     A.   Yes, they did.

17     Q.   When was that, sir?

18     A.   That occurred around 1973/74.  At the time I was

19  employed by the University of Dayton Research Institute.

20     Q.   What did that institute do?

21     A.   They did all kinds of research.  Being in Dayton,

22  it's close to the Air Force.  They did a lot of work for

23  Wright Patterson Air Force Base there, and I was part of

24  everything that they were doing to start work in the

25  medical area.

1    Q.   Can you give us a taste of what that work in the

2    medical area was at Dayton.

3    A.   It was very limited.  It was, the work that I was

4    doing related to heart mechanics.

5    Q.   And, after that position at Dayton, where did you

6    go next?

7    A.   To the University of Cincinnati.

8    Q.   And what was your position when you arrived at

9    the University of Cincinnati?

10   A.   I was an assistant professor of research in the

11   Department of Orthopedic Surgery.

12   Q.   So does the University of Cincinnati have a

13   teaching hospital?

14   A.   Yes.

15   Q.   And though bioengineering, you became -- began

16   working in a hospital environment?

17   A.   Well, a medical school environment.  And the

18   Department of Orthopedic Surgery where they train

19   residents in orthopedics.

20   Q.   And, as an engineer then in medical school, what

21   kind of studies did you undertake?

22   A.   My studies at the University of Cincinnati had

23   been almost exclusively related to ligament injuries,

24   diagnostics , how do you diagnose and how do you treat

25   ligament injuries of the knee joint.

1    Q.   Beginning in what year?

2    A.   The work would have begun in 1975.

3    Q.   Can you just -- I'm going to give the jury some

4    more anatomy later, but just tell the jury now the

5    initial types of injuries or conditions that your

6    studies involved.

7    A.   Some of the very early work had to do with what's

8    called an anterior cruciate ligament injury, I'm sure

9    you've heard of people who have had an ACL.  And there

10   was a medical device that was being sold at the time as

11   a prosthetic for the anterior cruciate ligament, and we

12   were evaluating whether it was acceptable or not.  And

13   ultimately testified to the FDA that it wasn't.  And

14   ultimately the device got taken off the market.

15   Q.   Now, when you were at the University of

16   Cincinnati in the research department, were you involved

17   in testing, gathering data, teaching?  What were your

18   day-to-day job --

19   A.   I was at the Department of Orthopedic Surgery at

20   the time.

21   Q.   Thank you.

22   A.   I was involved in doing research.  Most of the

23   research involved studies on human joints.  I was

24   involved in participating in clinical conferences where

25   cases would be presented by residents and the method of

1   treatment would be presented, and I would discuss the

2   biomechanical principles involved.  I was involved in

3   post-graduate education courses that were for orthopedic

4   surgeons who had already graduated and were going to get

5   some additional training from particular topic areas.

6   So those are some of the things that I did.

7       Q.  Did there come a point in your career when you

8   became involved with bracing?

9       A.  Yes.

10      Q.  When was the first time you became involved in

11  bracing in connection with your work at the University

12  of Cincinnati?

13      A.  I became particularly interested in knee bracing

14  sometime in the 1980s.  In the earlier to mid-1980s is

15  when I became interested and began to think about it and

16  figure out if there was something I might be able to do.

17      Q.  And did some particular event trigger that for

18  you?  Was there some reason that you decided that that

19  might be something to start investigating?

20      A.  We had an agreement -- I say we, it was a group

21  of individuals with 3M of the development of prostheses

22  to replace the ACL, and we had formed a small company

23  for doing the R&D involved.  And I was interested in

24  seeing that continue.  And I knew the only way that I

25  could continue was if we had a product.  So I began to

1    think about what products, and bracing looked

2    particularly appealing to me at that time.

3        Q.   And did you follow through with that, did you do

4    something, did you follow up on your interest in bracing

5    at that time?

6        A.   Yes.  Somewhere in the mid-to later 1980s, more

7    mid, we started developing a knee brace.  We worked on

8    that for quite a few years.  And, ultimately, we formed

9    another company called Brace Technologies, and we

10   started selling braces I believe somewhere around 1990,

11   end, or maybe 1989.

12       Q.   So the company actually came up with a brace

13   design --

14       A.   Yes.  I had a patent on a particular brace design

15   that was a unique design for the ante-cruciate ligament.

16   We had the components manufactured for us.  We assembled

17   it.  We had a network of distributors that were selling

18   the braces around the country.

19       Q.   And you did get a patent on the brace?

20       A.   Yes.

21       Q.   And the brace again was for ACL use?

22       A.   Could.  Could also be used for post-cruciate with

23   some modifications.

24       Q.   Can you tell the jury just generally how that

25   brace operated, just in general terms.

1      A.   The brace had some unique features to it.   One of

2    the features was that it was a very flexible brace.   I

3    recognized that most braces that were being sold at the

4    time, all braces that I was aware of, were very rigid

5    cages, very strong and very rigid.   And that a lot of

6    that rigidity was unnecessary, and, in fact, resulted in

7    abnormal forces being applied to the leg, which made

8    them uncomfortable.   And also those abnormal forces

9    contributed to the braces moving on the leg.   Keeping

10   the brace in one spot is always a problem.   The leg is

11   conical, your thighs have a greater circumference than

12   your calf does.   And so, if you put a brace on your leg

13   and it begins to slip down, it loosens further and can

14   slip down more ready.   Also braces tend to rotate on the

15   leg.   And, at least certain braces do, depending upon

16   what the forces are that are applied between the brace

17   and the leg.   And so I designed a brace that was very

18   flexible, except where it needed to be rigid.   And it

19   only needed to be rigid where it had to substitute for

20   the function of the ACL.   And I did that, I accomplished

21   that by misaligning the hinge of the brace with the

22   normal axis of motion of the knee.   The goal had been to

23   in large part to make the two axis align so that you

24   would wouldn't get any abnormal function, and I

25   intentionally misaligned them to produce the forces that

```
 1    we wanted to get.  And then I --
 2              THE COURT:  Let's stop at that point, we'll
 3    pick up at 1 o'clock.
 4              (Proceedings in Recess.)
 5
 6
 7
 8
 9                         CERTIFICATE
10
11
12        I, Susan A. Zielie, Official Court Reporter, do
      hereby certify that the foregoing transcript is correct.
13
14
                    /S/ SUSAN A. ZIELIE, RPR, CCR
15                  _____
16                    Susan A. Zielie, RPR, CCR
17
18
19
20
21
22
23
24
25
```